# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 20, 2016        Decided July 25, 2017

No. 16-7025

BRIAN WRENN, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00162)

*Alan Gura* argued the cause and filed the briefs for appellants.

*Herbert W. Titus*, *Robert J. Olson*, *William J. Olson*, *Jeremiah L. Morgan*, and *John S. Miles* were on the brief for *amici curiae* Gun Owners of America, Inc., et al. in support of appellants.

*Holly M. Johnson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren*

*L. AliKhan*, Deputy Solicitor General. *Richard S. Love*, Assistant Attorney General, entered an appearance.

*Adam K. Levin* and *Jonathan E. Lowy* were on the brief for *amicus curiae* The Brady Center to Prevent Gun Violence in support of appellees District of Columbia and Cathy L. Lanier.

*Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Joshua N. Auerbach*, Assistant Attorney General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Kamala D. Harris*, Attorney General, Office of the Attorney General for the State of California, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Douglas S. Chin*, Attorney General, Office of the Attorney General for the State of Hawaii, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, and *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, were on the brief for *amici curiae* States of Maryland, California, Connecticut, Hawaii, Illinois, Iowa, Massachusetts, New York, Oregon, and Washington in support of appellees.

*Paul R.Q. Wolfson* and *Walter A. Smith, Jr.* were on the brief for *amici curiae* DC Appleseed Center for Law & Justice, et al. in support of defendants-appellees.

*Deepak Gupta* was on the brief for *amicus curiae* Everytown For Gun Safety in support of appellees.

No. 16-7067

MATTHEW GRACE AND PINK PISTOLS,
APPELLEES

v.

DISTRICT OF COLUMBIA AND PETER NEWSHAM, IN HIS
OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE
METROPOLITAN POLICE DEPARTMENT,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-02234)

———

*Loren L. AliKhan*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With her on the briefs were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Holly M. Johnson*, Assistant Attorney General.

*Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Joshua N. Auerbach*, Assistant Attorney General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Kamala D. Harris*, Attorney General, Office of

4

the Attorney General for the State of California, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Douglas S. Chin*, Attorney General, Office of the Attorney General for the State of Hawaii, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, and *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, were on the brief for Maryland, California, Connecticut, Hawaii, Illinois, Iowa, Massachusetts, New York, Oregon, and Washington in support of appellants.

*Paul R.Q. Wolfson* and *Walter A. Smith, Jr.* were on the brief for *amici curiae* DC Appleseed Center for Law & Justice, et al. in support of defendants-appellants.

*Deepak Gupta* was on the brief for *amicus curiae* Everytown for Gun Safety in support of defendants-appellants.

*Adam K. Levin* and *Jonathan Lowy* were on the brief for *amicus curiae* Brady Center to Prevent Gun Violence in support of appellants District of Columbia and Cathy L. Lanier.

*David H. Thompson* argued the cause for appellees. With him on the brief was *Charles J. Cooper*, *Howard C. Nielson, Jr.*, *Peter A. Patterson*, and *John D. Ohlendorf*.

*Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *John R. Lopez, IV*, Solicitor General, *Keith Miller*, Assistant Solicitor General, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Marty J. Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Sean D. Reyes*, Attorney General, Office of the Attorney General for the State of Utah,

*Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Brad D. Schimel*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Peter K. Michael*, Attorney General, Office of the Attorney General for the State of Wyoming, *Luther Strange*, Attorney General, Office of the Attorney General for the State of Alabama, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Gregory F. Zoeller*, Attorney General, Office of the Attorney General for the State of Indiana, *Chris Koster*, Attorney General, Office of the Attorney General for the State of Missouri, *Timothy C. Fox*, Attorney General, Office of the Attorney General for the State of Montana, *Adam Paul Laxalt*, Attorney General, Office of the Attorney General for the State of Nevada, *Michael DeWine*, Attorney General, Office of the Attorney General for the State of Ohio, and *E. Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma were on the brief for Arizona, Alabama, Arkansas, Indiana, Missouri, Montana, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming in support of plaintiffs-appellees.

*Dan M. Peterson* and *C.D. Michel* were on the brief for *amici curiae* Western States Sheriffs' Association, et al. in support of plaintiffs-appellees.

*Paul D. Clement*, *Erin E. Murphy*, and *Christopher G. Michel* were on the brief for *amicus curiae* National Rifle Association of America, Inc. in support of plaintiffs-appellees.

*Herbert W. Titus*, *Robert J. Olson*, *William J. Olson*, *Jeremiah L. Morgan*, and *John S. Miles* were on the brief for *amicus curiae* Gun Owners of America, Inc., et al. in support of plaintiffs-appellees.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

GRIFFITH, *Circuit Judge*: Constitutional challenges to gun laws create peculiar puzzles for courts. In other areas, after all, a law's validity might turn on the value of its goals and the efficiency of its means. But gun laws almost always aim at the most compelling goal—saving lives—while evidence of their effects is almost always deeply contested. On top of that, the Supreme Court has offered little guidance. Its "first in-depth examination of the Second Amendment" is younger than the first iPhone. *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 634 (2008). And by its own admission, that first treatment manages to be mute on how to review gun laws in a range of other cases. *See id.* at 634. But listening closely to *Heller I* reveals this much at least: the Second Amendment erects some absolute barriers that no gun law may breach. This lesson will prove crucial as we consider the challenges presented in these cases to the District of Columbia's limits on carrying guns in public.

I

These cases involve the District's third major attempt in forty years at managing what the D.C. Council sees as the tension between public safety and the Second Amendment. In 1976, the District banned all handgun possession. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001). When that ban was struck down in *Heller I*, the Council followed it with a ban on carrying. *Id.* § 22-4504 (2009). And when *that* was struck down in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173

(D.D.C. 2014), the Council responded with the law challenged here, which confines carrying a handgun in public to those with a special need for self-defense.

The challenged D.C. Code provisions direct the District's police chief to promulgate regulations limiting licenses for the concealed carry of handguns (the only sort of carrying the Code allows) to those showing a "good reason to fear injury to [their] person or property" or "any other proper reason for carrying a pistol." *Id.* § 22-4506(a)-(b).[1] The Code also limits what the police chief may count as satisfying these two criteria, in the course of promulgating regulations and issuing licenses.

To receive a license based on the first prong—a "good reason to fear injury"—applicants must show a "special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A). The police chief's regulations further limit licenses granted on this basis to those who "allege, in writing, serious threats of death or serious bodily harm, any attacks on [their] person, or any theft of property from [their] person." D.C. Mun. Regs. tit. 24 § 2333.2-3.

For those seeking to establish some "other proper reason for carrying," the D.C. Code provides that an applicant's need to carry around cash or valuables as part of her job is sufficient. D.C. Code § 7-2509.11(1)(B). Two regulations implementing this criterion also specify that living or working "in a high crime area shall *not* by itself establish a good reason" to carry,

---

[1] The District currently allows some very limited carrying even without a permit. For example, owners may carry registered handguns for lawful recreational purposes and within their homes and places of business. D.C. Code § 22-4504.01.

D.C. Mun. Regs. tit. 24 § 2333.4 (emphasis added), but that having a close relative who is unable to meet his own special need for self-defense does. *Id.* § 2334.1.

We will refer to this ensemble of Code provisions and police regulations simply as the "good-reason" law or regulation. The D.C. Council thought this scheme justified in light of studies suggesting that expansive right-to-carry laws are associated with higher rates of crime and injury to innocents. The Council also cited the District's status as an urban area teeming with officials, diplomats, and major landmarks.

Before us are conflicting rulings in two cases before different district judges. Both cases involve plaintiffs denied a concealed-carry license solely for failing to show a special need for self-defense. Bringing the first case are Brian Wrenn, the Second Amendment Foundation, Inc., and two of its other members. The second case features Matthew Grace and the Pink Pistols, an organization in which Grace and other members champion the right of sexual minorities to carry guns for self-defense.

In each case, the plaintiffs sought a preliminary injunction barring the District from enforcing the good-reason regulation. In March 2016, a district judge denied the *Wrenn* plaintiffs' motion. Two months later, another district judge granted the *Grace* plaintiffs a preliminary injunction barring the District from enforcing the good-reason law against anyone. We combine the two appeals, over which we have jurisdiction under 28 U.S.C. § 1292(a)(1), and must consider all legal issues de novo, *see Abdullah v. Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014).

9

II

We begin by asking if Grace and Wrenn have met their burden to show their Second Amendment challenges are likely to prevail. That question has several components in this case. In many areas of constitutional law, regulations that impose on rights are subject to one of three tests that are more or less stringent depending on the right and the burden at stake. So-called rational-basis review requires the challenged law to bear a rational link to a legitimate public interest. Intermediate scrutiny looks for a substantial link to an important interest. And strict scrutiny demands that a law be narrowly tailored to a compelling public interest. *See generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 U.C.L.A. L. Rev. 1267 (2007).

Whether we need that three-tiered framework here is one issue we will address. Grace and Wrenn hope we can consider their challenge without bothering to decide which level of scrutiny to apply to the District's regulation. In fact, the District shares that hope. For their part, Grace and Wrenn argue that we should deem the good-reason regulation invalid without applying tiers of scrutiny because this regulation is analogous to the "total ban" that the Supreme Court struck down in *Heller I* without pausing to weigh its benefits. The District, by contrast, thinks the law warrants no particular scrutiny because it does not burden protected rights *at all*.

The parties split on what we should do if we ultimately decide to apply tiers of scrutiny. Under our precedent, if we apply tiers of scrutiny at all, the proper level to apply would turn on whether a gun law imposes "substantial[ly]" on the Second Amendment's "core." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1257 (D.C. Cir. 2011); *see also id.* at 1253, 1256-57. The plaintiffs say the good-reason law does so, thus inviting strict scrutiny. The District would have us

apply intermediate scrutiny on the ground that the law's burden is not substantial or falls outside the Amendment's core.

Whichever path we take, we must determine if the good-reason law impinges on a "core" Second Amendment right. So we begin there. The District argues that the Amendment's core does not cover public carrying at all, or that it does not protect carrying in densely populated areas like D.C., or that it does not extend to carrying unless there is a special need for self-defense. We take these three arguments in turn before considering the analysis of other circuit courts. Having thus judged whether the regulation impinges on core Second Amendment conduct, we will turn in Part III to determining and applying the proper form of review for these cases.

A

The "core" or "*central component*" of the Second Amendment right to keep and bear arms protects "individual self-defense," *McDonald v. City of Chicago*, 561 U.S. 742, 767-78 (2010) (internal quotation marks omitted), by "law-abiding, responsible citizens," *Heller I*, 554 U.S. at 635— though subject to certain "longstanding" regulations that limit the Amendment's scope, such as bans on possession "by felons and the mentally ill," *id.* No one doubts that under *Heller I* this core protection covers the right of a law-abiding citizen to keep in the home common firearms for self-defense.

Our first question is whether the Amendment's "core" extends to publicly carrying guns for self-defense. The District argues that it does not, citing *Heller I*'s observation that "the need for defense of self, family, and property is most acute" in the home. *Id.* at 628. But the fact that the need for self-defense is most pressing in the home doesn't mean that self-defense at home is the only right at the Amendment's core. After all, the

Amendment's "core lawful purpose" is self-defense, *id.* at 630, and the need for that might arise beyond as well as within the home. Moreover, the Amendment's text protects the right to "bear" as well as "keep" arms. For both reasons, it's more natural to view the Amendment's core as including a law-abiding citizen's right to carry common firearms for self-defense beyond the home (subject again to relevant "longstanding" regulations like bans on carrying "in sensitive places"). *Id.* at 626.

This reading finds support in parts of *Heller I* that speak louder than the Court's aside about where the need for guns is "most acute." That remark appears when *Heller I* turns to the particular ban on possession at issue there. By then the Court has spent over fifty pages giving independent and seemingly equal treatments to the right to "keep" and to "bear," first defining those "phrases" and then teasing out their implications. *See id.* at 570-628. In that long preliminary analysis, the Court elaborates that to "bear" means to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). That definition shows that the Amendment's core must span, in the Court's own words, the "right to possess *and carry* weapons in case of confrontation." *Id.* at 592 (emphasis added).

This first gloss on the Amendment's text and *Heller I*'s reasoning is reinforced by the history that *Heller I* deems essential for tracing the "*pre-existing* right" embodied by the Amendment. *Id.* at 592. *Heller I* pores over early sources to show that while preventing Congress from eliminating state militias was the "purpose that prompted the [Amendment's] codification," that purpose did not limit the right's substance,

which encompassed the personal right to armed self-defense. *Id.* at 599-600. Crucially, *Heller I* winds its way to this conclusion through a parade of early English, Founding-era, antebellum, and late-nineteenth century cases and commentaries. Those same sources attest that the Second Amendment squarely covers carrying beyond the home for self-defense.

Most of the relevant nineteenth-century cases, for example, assume the importance of carrying as well as possessing. Each puts another crack in the District's argument that carrying was peripheral to the right protected by the Amendment. *See Heller I*, 554 U.S. at 611-14, 629 (citing *State v. Reid*, 1 Ala. 612, 616-17 (1840) (allowing restrictions on the "manner of bearing arms" but not limits on carrying so severe "as to render [arms] wholly useless for the purpose of defence"); *Nunn v. State*, 1 Ga. 243, 251 (1846) (invalidating a ban on carrying insofar as it prohibited "bearing arms *openly*"); *State v. Chandler*, 5 La.Ann. 489 (1850) (observing that the Amendment shields a right to open carry); *Johnson v. Tompkins*, 13 F. Cas. 840, 852 (C.C. Pa. 1833) (finding in the Second Amendment and a state analogue "a right to carry arms in defence of [one's] property or person, and to use them, if . . . assailed with such force, numbers, or violence as made it necessary for [one's] protection or safety"); *Andrews v. State*, 50 Tenn. 165, 187 (1871) (invalidating a ban on carrying pistols "publicly or privately, without regard to time or place, or circumstances")); *see also Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1174 (9th Cir. 2014), *vacated*, 781 F.3d 1155, 1156-63 (9th Cir. 2015) (citing *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 93 (1822) (striking down a prohibition on "wearing concealed arms"); *Cockrum v. State*, 24 Tex. 394, 403 (1859) (allowing bans on the carrying of "exceeding[ly] destructive weapon[s]," but not total bans)). Indeed, the few nineteenth-century cases that *upheld* onerous limits on carrying against

challenges under the Second Amendment or close analogues are sapped of authority by *Heller I* because each of them assumed that the Amendment was only about militias and not personal self-defense. So *Heller I* rejects their crucial premise. "And with these cases off the table, the remaining cases speak with one voice" on the Amendment's coverage of carrying as well as keeping arms. *Peruta*, 742 F.3d at 1174. Under *Heller I*'s treatment of these and earlier cases and commentaries, history matters, and here it favors the plaintiffs.

The District retorts that self-defense in public must fall outside the Amendment's core protections because the Amendment was codified in order to keep Congress from eliminating state militias, a purpose that doesn't require allowing people to carry guns in times of peace. But again, it was *Heller I*'s *central holding* that the reason for the Amendment's passage did not narrow the sweep of its protections. *See* 554 U.S. at 598-600. Whatever motivated the Amendment, at its core was the right to self-defense. *Id.* at 630. Thus, the Amendment's core generally covers carrying in public for self-defense.

We say "generally" because, as noted, the Supreme Court has taught in *Heller I* that legal regulations of possession or carrying that are "longstanding"—including bans on possession by felons or bans on carrying near sensitive sites— reflect limits to the preexisting right protected by the Amendment. *Id.* at 626, 635. The District contends that this doctrine rescues the good-reason law. In the District's telling, Anglo-American history reveals two "longstanding" practices that so shrank the right later enshrined by the Amendment as to leave good-reason laws beyond its reach: so-called Northampton laws and surety laws.

14

B

Whatever the right to carry might cover, the District contends, it does not protect carrying in densely populated or urban areas like Washington, D.C. That is because the English right to bear arms had for centuries been fenced in by the Statute of Northampton, a law that banned carrying firearms in crowded areas. Indeed, Northampton-like laws had migrated to some colonies by the late 1700s, and then to several states in the mid-to-late 1800s. Thus, the District argues, the preexisting right codified by the Second Amendment did not (or did not at its core[2]) cover carrying in densely populated areas like D.C.

That argument pulls us—and both parties and several scholars—into dense historical weeds. The original Northampton statute took effect in 1328. Its language will faintly remind Anglophiles of studying *Canterbury Tales*—in the original. The rest of us may rest assured that the details of the text will matter less here than they did in English Lit:

> [I]t is enacted, that no man . . . of what condition soever he be, except the king's servants in his presence, and his ministers . . . and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence

---

[2] It is not clear whether the District believes Northampton laws show that carrying in densely populated areas falls outside the Amendment's protection altogether, or merely outside its core.

> of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

S.A. 36. The District argues that by forbidding all but the king's servants and ministers to bring "force in affray of the peace" or to "go [or] ride armed by night or by day" in "fairs" or "markets," this statute banned carrying in densely populated areas. So carrying in urban areas like D.C., the argument goes, falls beyond the Amendment's perimeter or at least its core.

The plaintiffs answer that the Supreme Court neutralized this argument in *Heller I* by citing Blackstone's understanding that Northampton banned only the carrying of "dangerous and unusual weapons." 554 U.S. at 627 (internal quotation marks omitted); *see also* 4 William Blackstone, Commentaries on the Laws of England *149. Plaintiffs and amici also point to an English case suggesting that by the 1600s, Northampton was understood to ban only the wielding of arms with evil intent or in such a way as "to terrify the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). The District offers its replies, to which the plaintiffs issue sur-replies, and on and on, until for every point there is an equal and opposite counterpoint.

Happily, though, the state of the law in Chaucer's England—or for that matter Shakespeare's or Cromwell's—is not decisive here. *Heller I* holds that by the time of the Founding, the "preexisting right" enshrined by the Amendment had ripened to include carrying more broadly than the District contends based on its reading of the 14th-century statute.

For one thing, the history showcased in *Heller I* contradicts the main scholar whose work the District cites for

the idea that Northampton banned all carrying in crowded areas (as opposed to carrying dangerous arms or carrying so as to terrify). On that scholar's view, Northampton so narrowed the English right embodied by the Amendment that "individual self-defense beyond the home deserves only minimalist protection or categorical exclusion." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 43 (2012). This view runs headlong into the history cited by the Supreme Court to show that the English "right secured in 1689 . . . was by the time of the founding understood to be an individual right protecting against both public and private violence," *Heller I*, 554 U.S. at 594, so that the resulting Amendment guarantees the right to "possess *and carry* weapons in case of confrontation," *id.* at 592 (emphasis added).

Early commentators seem to confirm that whatever Northampton banned on the shores of England or colonial America, the right to bear arms by the time of the Founding was thought to protect carrying for self-defense generally. Thus, *Heller I* cites the view of James Wilson—early commentator, virtual coauthor of the Constitution, and member of the Supreme Court's first cohort—that Founding-era Northampton laws banned only the carrying of "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." James Wilson, The Works of the Honourable James Wilson 79 (1804); *see also Heller I*, 554 U.S. at 627. Even more explicit (if less prominent) is one early commentary's observation that while

> [r]iding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . it should be remembered, that in this country the constitution guaranties to all persons the right to

> bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (Lexington, Ky., William Gibbes Hunt 1822); *see also* 1 William Hawkins, A Treatise of the Pleas of the Crown 135, ch. 63, § 4, at 135 (1716) ("[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people.").

So in light of *Heller I*, we can sidestep the historical debate on how the first Northampton law might have hindered Londoners in the Middle Ages. Common-law rights developed over time, and American commentaries spell out what early cases imply: the mature right captured by the Amendment was not hemmed in by longstanding bans on carrying in densely populated areas. Its protections today don't give out inside the Beltway.

## C

The District argues for one other limit to the Amendment: that its core excludes carrying absent special self-defense needs because carrying was always cabined by English "surety laws." These laws provided that if Oliver carried a pistol and Thomas said he reasonably feared that Oliver would injure him or breach the peace, Oliver had to post a bond to be used to cover any damage he might do, unless *he* proved he had reason to fear injury to his person or family or property. *Grace* S.A. 21-22. The District cites these laws as early precursors of its good-reason law to show that the conduct it blocks lies outside the Amendment's core.

But surety laws did not deny a responsible person carrying rights unless he showed a special need for self-defense. They only burdened someone reasonably accused of posing a threat. And even he could go on carrying without criminal penalty. He simply had to post money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense. Under surety laws, put simply, everyone started out with robust carrying rights. Those reasonably accused were then burdened. And only *then* did self-defense needs make a difference, by exempting even the accused from that burden. A showing of special need did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless.

More importantly, even if surety laws had made responsible citizens' freedom to carry turn on their need for self-defense, these laws would do little for the District's case. The Supreme Court has denied that indirect or purely civil burdens shed much light on the historical right embedded by the Amendment. In his *Heller I* dissent, Justice Breyer cited several laws to contradict the majority's reading of the Amendment, but the Court set them aside on the ground that "[a]ll of them" involved only "a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail)" rather than "significant criminal penalties." Such regulations, the Court reasoned, are "akin to modern penalties for minor public-safety infractions like speeding or jaywalking," which makes them (in the Court's view) poor evidence of limits on the Amendment's scope. 554 U.S. at 633-34.

Reading the Amendment, applying *Heller I*'s reasoning, and crediting key early sources, we conclude: the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those

lacking special self-defense needs—falls within the core of the Second Amendment's protections.

D

Other circuits reviewing good-reason regulations have disagreed, holding that burdens on carrying trigger only intermediate scrutiny because the right to carry merits less protection than the right to possess in *Heller I*. Each circuit court justifying this modest review of good-reason laws has relied on an inference from the tolerance in American law for certain other carrying regulations. But each of these courts has also dispensed with the historical digging that would have exposed that inference as faulty—digging that *Heller I* makes essential to locating the Amendment's edge, or at least its core.

The hasty inference appears in a Second Circuit opinion on New York's good-reason law, where the court reasons that the right to bear must count for less than the right to keep arms since the former has been regulated more rigorously. *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 94-97 (2d Cir. 2012).[3] The court cites, for example, *Heller I*'s approval of longstanding bans on carrying near sensitive sites. 701 F.3d at 94. But such traditional limits don't prove that the right to bear arms is weaker in our tradition since the right to keep arms has

---

[3] The Second Circuit also finds that carrying outside the home matters less based on analogies to other individual rights. Thus, it asks: if our law "[t]reat[s] the home as special" when it comes to sexual privacy rights, why not when enforcing the right to use a gun? *Kachalsky*, 701 F.3d at 94. But of course, sex is different. In Judge Posner's wry understatement, "the interest in having sex inside one's home is much greater than the interest in having sex on the sidewalk in front of one's home," while the need to fend off violence might arise on sidewalks and in bedrooms alike. *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012).

also been subject to longstanding regulations: *Heller I* itself cites bans on possession by felons. 554 U.S. at 626.

*Kachalsky* also notes that while several nineteenth-century courts may have struck down total bans on carrying, three upheld bans on bearing concealed or concealable weapons. 701 F.3d at 90, 94. The Fourth Circuit makes a similar point in applying intermediate scrutiny to another good-reason law. *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (quoting *United States v. Masciandaro*, 638 F.3d 458, 470-71 (4th Cir. 2011) for the proposition that "as we move outside the home, firearm rights have always been more limited," as shown by court decisions upholding bans on concealed carry).

There is, however, an easy way to explain the many cases tolerating limits on bearing, despite the parity of keeping and bearing in the Amendment's text, in *Heller I*'s textual analysis, in early commentaries, and in most early cases. The rights to keep and to bear, to possess and to carry, are equally important inasmuch as regulations on each must leave alternative channels for both. *See Heller II*, 670 F.3d at 1262 (analogizing certain gun laws deserving modest review to regulations that leave "ample alternative channels" for speech). It's simply that traditional carrying restrictions have generally left ample opportunities for bearing arms. To address an example cited by the Second Circuit, bans on carrying only in small pockets of the outside world (*e.g.*, near "sensitive" sites, *Heller I*, 554 U.S. at 626-27) impose only lightly on most people's right to "bear arms" in public. As Judge Posner writes: "[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places . . . ." *Moore*, 702 F.3d at 940. By contrast, a ban on owning or storing guns at home leaves no alternative channels for *keeping* arms.

The idea that the government must leave ample channels for keeping and for carrying arms explains much of the analysis in *Heller I*. It explains why *Heller I* saw no need to bother with "any of the [familiar] standards of scrutiny" in reviewing a ban on ownership that left *no* means of defense by handguns at home. 554 U.S. at 628. It explains why the Court favorably treated cases allowing bans on concealed carry only so long as open carry was allowed.[4] The Court itself highlighted this feature of those cases, *see id.* at 612-13, 629, explicitly describing one of them as limiting only the "manner" of exercising gun rights, *id.* at 626. The "ample alternative channels" principle also explains the Court's approval of bans on some types of guns so long as those most useful for self-defense remained accessible. *Id.* at 627. Indeed, this same principle makes an appearance in *Heller II* where we cite Professor Eugene Volokh's suggestion that courts applying the Second Amendment borrow from the law of "content neutral speech," which looks askance at "restrictions that impose severe burdens (because they don't leave open ample alternative channels)" for speech. 670 F.3d at 1262 (quoting Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. Rev. 1443, 1471 (2009)).

---

[4] *See State v. Chandler,* 5 La.Ann. 489, 489-90 (1850) (describing a law against the carrying of concealed weapons as one that "interfered with no man's right to carry arms . . . 'in full view,' which places men upon an equality"); *Nunn v. State,* 1 Ga. 243, 251 (1846) ("[S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, . . . it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void* . . . .").

These points confirm that the rights to keep and bear arms are on equal footing—that the law must leave responsible, law-abiding citizens some reasonable means of exercising each. The prevalence of, say, bans on carrying near sensitive sites would prove that the right to bear arms mattered less only if our law would reject equally modest burdens on *keeping* arms (*e.g.*, bans on storing them on open surfaces at home). Neither the Second nor the Fourth Circuit has suggested that it would. So each was too quick to infer that our legal tradition demotes the right to bear arms relative to its Constitutional twin.

Finally, the Third Circuit relied on the reasoning of the Second and Fourth Circuits for its decision to submit good-reason laws to intermediate scrutiny. *See Drake v. Filko*, 724 F.3d 426, 430 (3d Cir. 2013). The only other circuit to address the issue, the Ninth, reasoned that a good-reason limit on concealed carry must be lawful since outright *bans* on concealed carry have been upheld.[5] Relying on this whole-includes-its-parts reasoning, the Ninth Circuit expressly sidestepped our question of "whether the [Amendment] protects some ability to carry firearms in public, such as open carry." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016) (en banc).

Indeed, all of the circuits settling on a level of scrutiny to apply to good-reason laws explicitly declined to use *Heller I*'s historical method to determine how rigorously the Amendment

---

[5] We do not agree with the Ninth Circuit that a ban on concealed carry can be assessed in isolation from the rest of a jurisdiction's gun regulations. As we've noted, text and history and precedent urge that the Second Amendment requires governments to leave responsible citizens ample means for self-defense at home and outside. So a regulation's validity may turn partly on whether surrounding laws leave ample options for keeping and carrying.

applies beyond the home. [6] Each simply assumed for argument's sake that the Amendment covers *some* carrying. Though meant to be generous to the plaintiffs, by granting a premise in their favor, this move ultimately weakened the plaintiffs' case. It excused courts from sifting through sources pointing to the equal importance of the right to bear:

> [T]he Second, Third, and Fourth Circuits . . . declined to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home. . . . As a result, they misapprehend both the nature of the Second Amendment right and the implications of state laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes. . . . [They] failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms.

*Peruta*, 742 F.3d at 1173-75. Indeed, that conclusion is shared by the only other circuit that *has* surveyed the relevant history through the lens of *Heller I*: the Seventh. *See Moore*, 702 F.3d at 935-37 (striking down a more widely applicable carrying ban).

So we do not gainsay our sister circuits' considered judgments—only the assumptions that some of them made for

---

[6] *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (declining to "engag[e] in a round of full-blown historical analysis"); *Woollard*, 712 F.3d at 874-76 (eschewing "a definitive ruling" on the Amendment's scope); *Kachalsky*, 701 F.3d at 91 (deciding not to plumb "highly ambiguous history and tradition to determine the meaning of the Amendment").

argument's sake—when we conclude that (longstanding exceptions aside) carrying beyond the home, even in populated areas, even without special need, falls within the Amendment's coverage, indeed within its core.

## III

Having determined that the good-reason law impinges on core Second Amendment conduct, we now consider whether we should subject it to the tiers of scrutiny familiar from other realms of constitutional law. Grace and Wrenn argue that we should strike down the good-reason law without applying any such analysis, following the Supreme Court's approach to a "total ban" on gun ownership in *Heller I*. The District thinks the good-reason law is rather more mundane—not a total ban on carrying but a mere hurdle for individuals to clear before getting to carry. Thus, the District argues, we should apply intermediate scrutiny under *Heller II*.

We begin by revisiting *Heller I* to see why total bans are always invalid and what makes for a total ban in the first place. Doing so will make it hard to believe that the *Heller I* Court—which dispensed with tiers of scrutiny in striking down a ban on possession by almost everyone—would have gone easier on a law banning possession by everyone *but* that small minority with a special need to possess. Since possession and carrying are on par with each other, it will follow that the same categorical treatment should apply to the District's ban on *carrying* by all but the few who prove a special reason to carry.

Recall that under *Heller I*, the Second Amendment protects an individual right of responsible, law-abiding citizens to defend themselves. In particular, then, the right to carry is a right held by responsible, law-abiding citizens for self-defense. But self-defense against what? The most natural answer is that

the Amendment enables self-defense at least against the level of threat *generally* faced by those covered by the Amendment: responsible and law-abiding citizens. Likewise, "responsible" must include those who are no more dangerous with a gun than law-abiding citizens generally are. *Cf. Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015) (faulting a cap on gun registrations for trying to reduce gun ownership indiscriminately rather than zero in on likely abuses). At a minimum, then, the Second Amendment must enable armed self-defense by commonly situated citizens: those who possess common levels of need and pose only common levels of risk.

This analysis reflects the most sensible way of spelling out Second Amendment rights absent contrary clues in the Amendment's history as understood by *Heller I*: if the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class. Indeed, this reading fits naturally with *Heller I*'s holding about the meaning of "arms": just as the Amendment requires access to weapons "in common use," *id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), including the "most popular" self-defense weapon among citizens today, *id.* at 629, so must the Amendment enable defense under the *circumstances* common among citizens today. The reason for both points is the same: the early cases cited in *Heller I* envisioned that law-abiding citizens as a general rule would be entitled to have and carry arms for self-defense. So the class of arms protected must include guns in common use; and the class of citizens who can wield them must include those with common levels of competence and responsibility—and need.

Longstanding regulations aside, then, the Amendment shields at least the ability to carry common arms in self-defense for citizens who are commonly situated in the ways just

mentioned. Yet the District's good-reason law bars most people from exercising this right at all. To be sure, the good-reason law leaves each D.C. resident some remote chance of one day carrying in self-defense, but that isn't the question. The Second Amendment doesn't secure a right to have some chance at self-defense. Again, at a minimum the Amendment's core must protect carrying given the risks and needs typical of law-abiding citizens. *That* is a right that most D.C. residents can never exercise, by the law's very design. In this way, the District's regulation *completely* prohibits most residents from exercising the constitutional right to bear arms as viewed in the light cast by history and *Heller I*.

And under *Heller I*, "complete prohibition[s]" of Second Amendment rights are always invalid. *Id.* at 629. It's appropriate to strike down such "total ban[s]" without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right. *Id.* With this categorical approach to such bans, *Heller I* ensured that judicial tests for implementing gun rights would not be misused to swallow those rights whole. *Heller I* essentially held that the right to keep and bear arms must mean at an absolute minimum the right to own a gun, so any acceptable standard of review would have to accommodate that fact. By declining to apply tiers of scrutiny to a total ban on ownership, *Heller I* closed off the possibility that courts would erroneously find some benefits weighty enough to justify other effective bans on the right to keep common arms. We would flout this lesson of *Heller I* if we proceeded as if some benefits could justify laws that necessarily destroy the ordinarily situated citizen's right to *bear* common arms—a right also guaranteed by the Amendment, on the most natural reading of *Heller I*.

Of course, the good-reason law isn't a "total ban" *for the D.C. population as a whole* of the right to bear common arms under common circumstances. After all, it allows some D.C. residents—those with a special need—to defend against threats both common to everyone *and* specific to themselves. But the ban on ownership struck down in *Heller I* also made "minor exceptions" for certain sorts of owners, who could then defend their homes to the hilt. 554 U.S. at 570 n.1. That made no difference to constitutional review of the ban, *see id.*, for a simple reason: the point of the Amendment isn't to ensure that some guns would find their way into D.C., but that guns would be available to each *responsible citizen* as a rule (*i.e.*, at least to those no more prone to misuse that access than anyone else). So if *Heller I* dictates a certain treatment of "total bans" on Second Amendment rights, that treatment must apply to total bans on carrying (or possession) by ordinarily situated *individuals* covered by the Amendment.

This point brings into focus the legally decisive fact: the good-reason law is necessarily a total ban on most D.C. residents' right to carry a gun in the face of ordinary self-defense needs, where these residents are no more dangerous with a gun than the next law-abiding citizen. We say "necessarily" because the law destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations (like those upheld in *Heller II* and *Heller III*), but by design: it looks precisely for needs "distinguishable" from those of the community. So we needn't pause to apply tiers of scrutiny, as if strong enough showings of public benefits could save this destruction of so many commonly situated D.C. residents' constitutional right to bear common arms for self-defense in any fashion at all. Bans on the ability of most citizens to exercise an enumerated right would have to flunk any judicial test that was appropriately

written and applied, so we strike down the District's law here apart from any particular balancing test.

Indeed, as noted, it seems highly doubtful that the *Heller I* Court would have acted any differently in reviewing a good-reason regulation on *possession*—one limiting gun ownership to that minority of residents with more-than-common needs for self-defense at home. Yet possession and carrying—keeping and bearing—are on equal footing. So *Heller I*'s language and logic all but dictate that no tiers-of-scrutiny analysis could deliver the good-reason law a clean bill of constitutional health.

*Heller I*'s categorical approach is appropriate here even though our previous cases have always applied tiers of scrutiny to gun laws. To be sure, *Heller II* spoke generally of "adopt[ing] . . . a two-step approach" for reviewing "the District's gun laws," which would "ask first whether a particular provision" burdens a Second Amendment right and then, "if it does, go on to determine whether the provision passes muster *under the appropriate level of constitutional scrutiny*." 670 F.3d at 1252 (emphasis added). Though somewhat open-ended, this language standing alone would suggest that we apply only intermediate or strict scrutiny to every burdensome gun law we ever review. But *another* passage in *Heller II* expressly limited the opinion's framework to laws "significantly less severe" than a "total prohibition." *Id.* at 1266. We believe this caveat—which *Heller II* offered to distinguish *Heller I*—was in fact required by *Heller I*'s example. So we read this explicit limit in *Heller II* as controlling that decision's more generic embrace of "level[s] of constitutional scrutiny." 670 F.3d at 1252; *cf. Gerhardson v. Gopher News Co.*, 698 F.2d 1052, 1059 (8th Cir. 2012) ("We will not interpret our precedent in a way that is inconsistent with binding Supreme Court authority."). True, our gun cases have never *applied* a more categorical approach, but then

we've never been asked to review so much as a "substantial" burden on a "core" protected right, to say nothing of a ban. *That* is why we have always relied on the familiar tiers of scrutiny; in fact, we've never applied more than intermediate scrutiny.

This is different. Here *Heller I*'s approach is more fitting. Indeed, it fits so tightly that this approach would rarely (if ever) apply in cases we can imagine arising in the future. Most other regulations won't deprive even *ordinarily* situated citizens of *all* means of carrying (or possessing) handguns in self-defense, as the good-reason law seems almost engineered to do.

So our approach, briefed by all the parties, is also urged by *Heller I* and coheres with *Heller II*. It's narrower than any other basis for decision but not *ad hoc*. And it would avoid suggesting what *Heller I* implicitly denies: that some public benefits could justify preventing people from exercising the law-abiding citizen's right to bear arms for self-defense given the risk and needs typical of, well, law-abiding citizens.

We pause to draw together all the pieces of our analysis: At the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions. These traditional limits include, for instance, licensing requirements, but not bans on carrying in urban areas like D.C. or bans on carrying absent a special need for self-defense. In fact, the Amendment's core at a minimum shields the typically situated citizen's ability to carry common arms generally. The District's good-reason law is necessarily a total ban on exercises of that constitutional right for most D.C. residents. That's enough to sink this law under *Heller I*.

IV

Because they sought a preliminary injunction, plaintiffs below had the burden to show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [and] that the balance of equities," including the public interest, "tips in [their] favor." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). But here the merits of the plaintiffs' challenge are certain and don't turn on disputed facts, so our analysis can stop at the first, merits prong of this inquiry. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2332 (2013) (affirming circuit court's affirmance of a grant of a preliminary injunction based only on the merits of petitioners' constitutional challenge).

Indeed, since our holding at this stage makes a certain outcome "inevitable" in these cases, "we have power to dispose [of it] 'as may be just under the circumstances,'" *Gross v. United States*, 390 U.S. 62, 71 (1968) (quoting 28 U.S.C. § 2106), and should do so "to obviate further and entirely unnecessary proceedings below," *id.* at 72; *see also Indep. Bankers Ass'n of Am. v. Heimann*, 613 F.2d 1164, 1167 (D.C. Cir. 1979) ("Although the case could now be remanded to the District Court for a decision on the merits, we have concluded that such a course is unnecessary and indeed would be unduly wasteful of judicial resources.") (citing 28 U.S.C. § 2106). Because the District's good-reason law merits invalidation under *Heller I* regardless of its precise benefits, we would be wasting judicial resources if we remanded for the court to develop the records in these cases. *Cf. Moore*, 702 F.3d at 942 (reversing denials of preliminary injunctions and remanding with instructions to enter declarations of unconstitutionality and permanent injunctions).

31

***

To watch the news for even a week in any major city is to give up any illusions about "the problem of handgun violence in this country." *Heller I*, 554 U.S. at 570. The District has understandably sought to fight this scourge with every legal tool at its disposal. For that long struggle against gun violence, you might see in today's decision a defeat; you might see the opposite. To say whether it is one or the other is beyond our ken here. We are bound to leave the District as much space to regulate as the Constitution allows—but no more. Just so, our opinion does little more than trace the boundaries laid in 1791 and flagged in *Heller I*. And the resulting decision rests on a rule so narrow that good-reason laws seem almost uniquely designed to defy it: that the law-abiding citizen's right to bear common arms must enable the typical citizen to carry a gun.

We vacate both orders below and remand with instructions to enter permanent injunctions against enforcement of the District's good-reason law.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting:

My colleagues conclude that the District's "good reason" regulation is categorically barred by the Second Amendment. I disagree.[1]

Assuming *arguendo* that the Second Amendment's individual right to keep and bear arms extends beyond the home,[2] *see Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (declining "to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home"); *Peruta v. Cty. of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016) (en banc) (same); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (same); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (same), the proper standard of review "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). "Nothing in *Heller* [*I*] suggests a case involving a restriction significantly less severe than the total prohibition of handguns at issue there could or should be resolved without reference to one or another of the familiar constitutional standards of scrutiny." *Id.* at 1266 (internal quotation marks omitted). Although "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong

---

[1] I would affirm the denial of preliminary injunctive relief in *Wrenn v. District of Columbia*, 167 F. Supp. 3d 86 (D.D.C. 2016), and reverse the grant of preliminary injunctive relief in *Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016).

[2] Although I assume that the Second Amendment extends to some extent beyond the home, I am certain the *core* Second Amendment right does not. The application of strict scrutiny—let alone my colleagues' application of a categorical ban—is, in my view, patently off-base.

justification, . . . a regulation that imposes a less substantial burden should be proportionately easier to justify." *Id.* at 1257.

The sole Second Amendment "core" right is the right to possess arms for self-defense in the home. *Drake*, 724 F.3d at 431 ("[T]he individual right to bear arms for the purpose of self-defense [in] the home [is] the 'core' of the right as identified by *Heller*."); *Kachalsky*, 701 F.3d at 89 ("Second Amendment guarantees are at their zenith within the home."); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) ("[A] lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home."). This conclusion is evidenced, first and foremost, by the United States Supreme Court's declarations in *District of Columbia v. Heller (Heller I)* that the "the need for defense of self, family, and property is *most acute*" in the home, 554 U.S. 570, 628 (2008) (emphasis added), and in *McDonald v. City of Chicago* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, *most notably* for self-defense within the home," 561 U.S. 742, 780 (2010) (emphasis added). By characterizing the Second Amendment right as *most* notable and *most* acute in the home, the Supreme Court necessarily implied that that right is *less* notable and *less* acute outside the home. *See Drake*, 724 F.3d at 431; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 89; *Masciandaro*, 638 F.3d at 471. A right that is less notable and less acute cannot reside at the Second Amendment's core. My colleagues attempt to minimize the Supreme Court's declarations by insisting that the relevant history speaks with "one voice on the Amendment's coverage of carrying as well as keeping arms." Maj. Op. 12-13 (internal quotation marks omitted). But their view of history is with blinders on as it is contradicted by our sister circuits' extensive review of the same historical

record.[3] *Kachalsky*, 701 F.3d at 91 ("History and tradition do not speak with one voice here. What history demonstrates is that states often disagreed as to the scope of the right to bear arms, whether the right was embodied in a state constitution or the Second Amendment."); *Drake*, 724 F.3d at 431 (same); *Masciandaro*, 638 F.3d at 470-71 ("[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."); *cf. Peruta*, 824 F.3d at 939 (in U.S. history, "the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public"). I would join these circuits and find that the "core" Second Amendment right does not extend beyond the home given the history upholding "public carry" regulations, a history "enshrined with[in] the scope of the Second Amendment when it was adopted." *Kachalsky*, 701 F.3d at 96 (alteration in original) ("The historical prevalence of the regulation of firearms in public demonstrates that while the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of

---

[3] The majority acknowledges that other circuits have identified regulations, including bans, regarding the public bearing of arms that were upheld by nineteenth-century courts. *See Kachalsky*, 701 F.3d at 94-96; *accord Woollard*, 712 F.3d at 876 (quoting *Masciandaro*, 638 F.3d at 470-71). They then discount those decisions as having applied a Second Amendment corollary to the First Amendment's "ample alternative channels" doctrine. Maj. Op. 20-22. I am not ready to revise history by asserting that nineteenth-century courts used reasoning first articulated a century later. *See Peruta*, 824 F.3d at 942.

concerns with regard to handgun ownership and use in public."). Regulations restricting public carrying are all the more compelling in a geographically small but heavily populated urban area like the District. *See* Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 108 (2013) ("American cities have traditionally had much more stringent gun control than rural areas.").

Because the District's good reason regulation does not affect firearm possession within the home and therefore does not "impose[] a substantial burden upon the core right of self-defense protected by the Second Amendment," I believe the correct standard of review is, at most, intermediate scrutiny. *Heller II*, 670 F.3d at 1257; *accord Woollard*, 712 F.3d at 878 (recognizing "longstanding out-of-the-home/in-the-home distinction bear[ing] directly on the level of scrutiny applicable"); *Kachalsky*, 701 F.3d at 96 ("Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case."). For the District's challenged licensing regime to pass muster under intermediate scrutiny, it must show that the regime is "substantially related to an important governmental objective." *Heller II*, 670 F.3d at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "That is, the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'" *Id.* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). "It essentially imposes a balancing test: the law is constitutional if 'the governmental interest outweighs the burden [on constitutional rights] and cannot be achieved by means that do not infringe . . . rights as significantly.'" *Heller v. D.C. (Heller III)*, 801 F.3d 264, 282 (D.C. Cir. 2015)

(Henderson, J., concurring in part and dissenting in part) (quoting *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 n. 7 (1983)).

As I have previously written, two additional well-grounded principles should guide the intermediate scrutiny analysis of the District's good reason regulation. *Id.* at 282-84. First, "the nature of firearms regulation requires ample deference to the legislature." *Id.* at 282. Ample deference stems from the recognition that gun laws involve a "'complex and dynamic' issue implicating 'vast amounts of data' that the legislature is far better equipped to gather and analyze." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-64 (1994)); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (in national security context, "information can be difficult to obtain and the impact of certain conduct difficult to assess").

Second, the District of Columbia is unique. *Heller III*, 801 F.3d at 283 (Henderson, J., concurring in part and dissenting in part). It is the seat of our national government, "a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrations and, perhaps most pertinent, countless government buildings where citizens are almost universally prohibited from possessing firearms." *Id.* Accordingly, our analysis should reflect an appreciation of "the unique challenges that confront the District as it struggles to regulate firearms in our Nation's capital." *Id.* (citing *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 439-40 (2002)).

I believe the District's good reason regulation passes muster under intermediate scrutiny. The District identifies two important government objectives underlying its licensing regime: the prevention of crime and the promotion of public safety. *Wrenn* Appellee Br. 41. In *Heller III*, we held, unsurprisingly, that "promoting public safety" is indeed a

substantial government interest.[4] *Heller III*, 801 F.3d at 274. The District has provided evidence that its licensing regime "promotes [that] substantial governmental interest [in a way] that would be achieved less effectively absent the regulation," and, at the same time, is not "substantially broader than necessary." *Id.* at 272 (quoting *Heller II*, 670 F.3d at 1258). Namely, the District highlights the empirical connection between a profusion of guns and increased violent crime, relying on, *inter alia*, the studies of leading researchers, including the National Research Council, and of the legislatures of New York, Maryland and New Jersey—all of which have put in place similar licensing regimes. *Wrenn* Appellee Br. 41-45. Moreover, the District points to the expert testimony of District Police Chief Cathy Lanier as well as commentary from the United States Secret Service and United States Capitol Police explaining the District's special security concerns that warrant firearms restrictions. *Id.* at 44. The District's good reason regulation constitutes its legislature's analysis of a "complex and dynamic" situation, an analysis that examines "vast amounts of data" and considers the unique needs of the District. *Heller III*, 801 F.3d at 283 (Henderson, J., concurring in part and dissenting in part). The good reason regulation that emerged deserves "ample deference," *id.* at 282, that is, a deference that recognizes

> [i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments. Indeed, assessing the risks and benefits of handgun possession and shaping a licensing scheme to maximize the competing public-policy objectives, as [the District] did, is precisely the type of discretionary judgment that officials in the

---

[4] The Supreme Court has also referred to "the significant governmental interest in public safety." *Schneck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357, 376 (1997).

legislative and executive branches of state government regularly make.

*Kachalsky*, 701 F.3d at 99. At bottom, firearms regulation "is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights . . . . If ever there was an occasion for restraint, this would seem to be it." *Masciandaro*, 638 F.3d at 475-76.

Accordingly, I respectfully dissent.