# United States Court of Appeals
## For the First Circuit

No. 17-2202

MICHAEL GOULD, et al.,

Plaintiffs, Appellants,

v.

MARK MORGAN, in his Official Capacity as Acting Chief of the
Brookline Police Department; WILLIAM G. GROSS, in his Official
Capacity as Commissioner of the Boston Police Department*; and
COMMONWEALTH OF MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

David H. Thompson, with whom Peter A. Patterson, John D.
Ohlendorf, Cooper & Kirk, PLLC, David D. Jensen, and David Jensen
PLLC were on brief, for appellants.
Stephen P. Halbrook, John Parker Sweeney, James W. Porter,
III, T. Sky Woodward, and Bradley Arant Boult Cummings LLP on brief
for National Rifle Association of America, Inc., amicus curiae.

---

*Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Commissioner William G. Gross has been substituted for former
Commissioner William B. Evans as respondent.

Mark Brnovich, Attorney General of Arizona, Oramel H. (O.H.) Skinner, Chief of Government Accountability & Special Litigation, Dominic E. Draye, Solicitor General, and Angela Kebric Paton, Assistant Solicitor General, Arizona Attorney General's Office, on brief for states of Arizona, Alabama, Arkansas, Georgia, Idaho, Indiana, Louisiana, Michigan, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming, amici curiae.

Matthew M. McGarry, Assistant Corporation Counsel, City of Boston Law Department, with whom Peter M. Geraghty, Assistant Corporation Counsel, Office of Legal Advisor, Boston Police Department, was on brief, for appellee Evans.

Jonathan E. Taylor, with whom John Buchheit, Office of Town Counsel, Deepak Gupta, and Gupta Wessler PLLC were on brief, for appellee Morgan.

Timothy J. Casey, Assistant Attorney General, Government Bureau, with whom Maura Healey, Attorney General, was on brief, for appellee Massachusetts Office of the Attorney General.

Gurbir S. Grewal, Attorney General of New Jersey, Andrew J. Bruck, Executive Assistant Attorney General, Jeremy M. Feigenbaum, Assistant Attorney General, Claudia Joy DeMitro and Adam D. Klein, Deputy Attorneys General, on brief, for states of New Jersey, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, New York, Rhode Island, and Virginia, and District of Columbia, amici curiae.

E. Ross Cohen, Mark C. Fleming, Tasha J. Bahal, and Wilmer Cutler Pickering Hale and Dorr LLP on brief for Everytown for Gun Safety, amicus curiae.

Ira M. Feinberg, Shaun M. Donnelly, and Hogan Lovells US LLP on brief for various Professors of History and Constitutional Law, amici curiae.

Simon J. Frankel, Nandini Singh, Allison M. Whelan, Covington & Burling LLP, J. Adam Skaggs, and Hannah Shearer on brief for Giffords Law Center to Prevent Gun Violence, amicus curiae.

Antonio J. Perez-Marques, David B. Toscano, Kevin Osowski, Sushila Rao, Anne Burton-Walsh, and Davis Polk & Wardwell LLP for Prosecutors Against Gun Violence, amicus curiae.

---

November 2, 2018

---

**SELYA**, **Circuit Judge**. This case involves a constitutional challenge to the Massachusetts firearms licensing statute, as implemented in the communities of Boston and Brookline. All of the individual plaintiffs sought and received licenses from one of those two communities to carry firearms in public. The licenses, though, were restricted: they allowed the plaintiffs to carry firearms only in relation to certain specified activities but denied them the right to carry firearms more generally.

The plaintiffs say that the Massachusetts firearms licensing statute, as implemented in Boston and Brookline, violates the Second Amendment. The district court disagreed, and so do we. Mindful that "the right secured by the Second Amendment is not unlimited," District of Columbia v. Heller, 554 U.S. 570, 626 (2008), we hold that the challenged regime bears a substantial relationship to important governmental interests in promoting public safety and crime prevention without offending the plaintiffs' Second Amendment rights. Accordingly, we affirm the district court's entry of summary judgment for the defendants. In the last analysis, the plaintiffs simply do not have the right "to carry arms for any sort of confrontation" or "for whatever purpose" they may choose. Id. at 595, 626 (emphasis omitted).

I. BACKGROUND

We start by rehearsing the applicable statutory and regulatory scheme and then recount the travel of the case. In

- 3 -

Massachusetts, carrying a firearm in public without a license is a crime.  See Mass. Gen. Laws ch. 269, § 10(a); see also Hightower v. City of Bos., 693 F.3d 61, 65 (1st Cir. 2012).  The Massachusetts firearms licensing statute "is part of a large regulatory scheme to promote the public safety."  Commonwealth v. Davis, 343 N.E.2d 847, 849 (Mass. 1976).  Under its current incarnation, Mass. Gen. Laws ch. 140, § 131, an individual may request a license to carry a firearm in public by submitting an application to the appropriate licensing authority, which is defined as either the applicant's local "chief of police or the board or officer having control of the police in a city or town, or persons authorized by them."  Id. § 121; see § 131(d).  Such a license allows the holder to:

> purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper.

Id. § 131(a).  For this purpose, a firearm is defined as "a stun gun or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16

- 4 -

inches or 18 inches in the case of a shotgun as originally manufactured."  Id. § 121.

The Massachusetts statute describes the circumstances in which a license to carry may be granted, denied, revoked, or restricted to particular uses.  See id. § 131.  Pertinently, a local licensing authority "may issue [a license] if it appears that the applicant is not a prohibited person . . . and that the applicant has good reason to fear injury . . . or for any other reason, including the carrying of firearms for use in sport or target practice only."  Id. § 131(d).  An applicant is a "prohibited person" if the licensing authority determines, inter alia, that he is a convicted felon, that he is younger than twenty-one years of age, or that he is otherwise unsuitable (by reason of, say, mental illness or involvement in domestic violence) to receive a license to carry.  Id.; see generally Chief of Police of Worcester v. Holden, 26 N.E.3d 715, 724 (Mass. 2015) (discussing "suitable person" standard).

Once the licensing authority satisfies itself that the applicant is not a prohibited person, it may issue a license to carry as long as "the applicant can demonstrate a 'proper purpose' for carrying a firearm."  Ruggiero v. Police Comm'r of Bos., 464 N.E.2d 104, 107 (Mass. App. Ct. 1984).  Refined to bare essence, the statute identifies two pillars upon which the granting of a license to carry may rest:  (1) good reason to fear injury, and

(2) other reasons (such as sport or target practice).  See id.
Municipalities differ in their requirements for an applicant to
establish eligibility based on the first pillar.  Boston and
Brookline have both promulgated policies requiring that an
applicant furnish some information to distinguish his own need for
self-defense from that of the general public.  This requirement —
which is the focal point of the plaintiffs' challenge — means that
the applicant must identify a specific need, that is, a need above
and beyond a generalized desire to be safe.  Cf. id. at 108 (finding
insufficient applicant's statement that he had no intention of
"spend[ing] his entire life behind locked doors [and was] a
potential victim of crimes against his  person").

An applicant who does not demonstrate a good reason to
fear injury either to himself or to his property may still receive
a license to carry a firearm; subject, however, to such
restrictions as the licensing authority deems meet.  See Mass.
Gen. Laws ch. 140, § 131(a), (d).  The statutory scheme vests in
the licensing authority discretion to decide, on a case-by-case
basis, whether and to what extent a restricted license should be
issued.  See id.  Under this arrangement, a licensing authority
may issue a restricted license that permits the carrying of a
firearm only when the applicant is engaged in the particular
activities specified in his application.  See Ruggiero, 464 N.E.2d
at 107 & n.5.

Not all communities offer the same types of restricted licenses. Boston offers licenses restricted to employment, hunting and target practice, or sport. For its part, Brookline offers licenses subject to restrictions for employment, hunting, target practice, sport, transport, domestic (use only in and around one's home), or collecting. A license restricted to employment allows the licensee to carry a firearm for all employment-related purposes, that is, while working and while traveling to and from work. A license restricted to hunting allows the licensee to carry a firearm for lawful hunting of game and fowl. Similarly, a license restricted to sport allows the licensee to carry a firearm while partaking in hunting, target practice, and a wide variety of outdoor recreational activities (such as hiking, camping, and cross-country skiing).

In Boston, slightly more than forty percent of all licenses are issued without restrictions of any kind. In Brookline, the number shrinks to approximately thirty-five percent.[1] Every such license (whether or not restricted) permits the licensee to keep and carry firearms for personal protection in the home.

---

[1] Boston and Brookline are not the only communities that make prolific use of restricted licenses. In 2015, fourteen communities (including Springfield, Lowell, New Bedford, Newton, and Medford) imposed restrictions on more than half of the licenses that they issued. Eleven other communities imposed restrictions on more than one-third of the licenses that they issued.

Once issued, a license may be revoked or suspended "upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed" or "if it appears that the holder is no longer a suitable person to possess such license." Mass. Gen. Laws ch. 140, § 131(f). Any person "aggrieved by a denial, revocation, suspension or restriction placed on a license" may seek judicial review. Id.; see Hightower, 693 F.3d at 67. Such redress must be sought within ninety days when challenging a denial, revocation, or suspension. See Mass. Gen. Laws ch. 140, § 131(f). In contrast, judicial review may be sought at "any time" when challenging a restriction. Id.

Against this backdrop, we turn to the particulars of the case at hand. The individual plaintiffs (none of whom is a prohibited person) all reside in either Boston or Brookline. In each community, the local licensing authority is the chief of police.

For present purposes, the firearms licensing policies of the two communities are not materially different. Both police departments review applications for firearms licenses individually, giving careful attention to each applicant and to his stated reasons for wanting a license. Each police chief has promulgated a policy to the effect that a generalized desire to carry a firearm for self-defense, without more, will not constitute

"good reason" sufficient to warrant the issuance of an unrestricted license. Instead, Boston and Brookline require an applicant to articulate a reason to fear injury to himself or his property that distinguishes him from the general population. Applicants who are employed in certain vocations (specifically, physicians, attorneys, and police officers) are more likely to be granted unrestricted licenses in both communities.[2]

The individual plaintiffs all sought and obtained licenses to carry firearms, but those licenses were issued with a variety of restrictions:

- Plaintiff Michael Gould is a professional photographer who lives in Brookline. In 2014, the Brookline Police Department granted him a license to carry firearms, restricted to employment and sport. These restrictions allow him to carry firearms on his person at home and whenever he is working with his high-priced photography equipment or when engaged in a range of recreational activities.

- Plaintiffs Christopher Hart, John Stanton, Danny Weng, and Sarah Zesch live in Boston. Each of them

_____

[2] Boston (but not Brookline) also will grant unrestricted licenses to applicants who already have been issued unrestricted licenses by some other community in Massachusetts.

applied for an unrestricted firearms license but received a restricted license (containing hunting and target-practice restrictions).

The complaint alleges that each of the individual plaintiffs seeks an unrestricted license to carry firearms in public for the purpose of self-defense.

The individual plaintiffs are joined by plaintiff Commonwealth Second Amendment, Inc. (Comm2A), a non-profit organization dedicated to advancing the right to keep and bear arms. All of the individual plaintiffs are members of Comm2A.

Although all of the individual plaintiffs wish to have unrestricted firearms licenses for personal protection, none of them has tried to show that his or her fear of injury is in any way distinct from that of the general population. Thus, none of them has been able to satisfy Boston's or Brookline's "good reason" standard.

Invoking 42 U.S.C. § 1983, the plaintiffs brought suit in the United States District Court for the District of Massachusetts against the chiefs of police of Boston and Brookline. They alleged that these officials, acting under color of state law, infringed their Second Amendment rights. To remedy this infringement, the plaintiffs sought a declaration that the Massachusetts firearms licensing statute, as administered in Boston and Brookline, transgressed the Second Amendment by

allowing licensing authorities to deny unrestricted licenses to otherwise qualified individuals who lack a particularized reason to fear injury. See 28 U.S.C. §§ 2201, 2202. They also sought injunctive relief directing the defendants to remove all restrictions from the licenses held by the individual plaintiffs and barring the defendants from issuing restricted licenses in the future.

On motion, the district court allowed the Office of the Attorney General of the Commonwealth of Massachusetts to join the fray as an intervenor-defendant. See Fed. R. Civ. P. 24(a)(1). After the close of discovery, the parties cross-moved for summary judgment. The district court, in a thoughtful rescript, granted summary judgment for the defendants. See Gould v. O'Leary, 291 F. Supp. 3d 155, 174 (D. Mass. 2017). In its ruling, the district court first assumed (without deciding) that the challenged statutory and regulatory scheme burdened the Second Amendment right to bear arms. See id. at 169. Next, it determined that intermediate scrutiny comprised the appropriate lens through which to view the constitutionality of the challenged law. See id. at 170. Finally, the court concluded that the challenged statutory and regulatory scheme passed intermediate scrutiny: it bore a substantial relationship to the important governmental interests of promoting public safety and preventing crime. See id. at 173. In reaching this conclusion, the court ceded some deference to the

predictive judgments of the legislature "regarding matters that are beyond the competence of" courts.  Id. at 171 (quoting Kachalsky v. Cty. of Westchester, 701 F.3d 81, 97 (2d Cir. 2012)).

This timely appeal ensued.  The parties have filed exemplary briefs, and those submissions have been supplemented by a myriad of helpful amicus briefs.

## II. FRAMING THE ISSUE

Before plunging into the merits of the plaintiffs' claims, we pause for some additional stage-setting.  To begin, we note that the plaintiffs' appeal hinges on the answers to two central questions:  Does the Second Amendment protect the right to carry a firearm outside the home for self-defense?  And if they prevail on that question, may the government condition the exercise of the right to bear arms on a showing that a citizen has a "good reason" (beyond a generalized desire for self-defense) for carrying a firearm outside the home?  Undergirding the plaintiffs' proposed answers to these questions is their claim that the manner in which Boston and Brookline have interpreted the Massachusetts "good reason" requirement offends the Second Amendment. Importantly, though, the plaintiffs do not challenge the Massachusetts firearms licensing statute as a whole, nor do they challenge the Commonwealth's requirement that an individual must have a license to carry firearms in public.

- 12 -

Because the plaintiffs' appeal is based exclusively upon the Second Amendment, our analysis follows suit. Consequently, we do not consider — let alone foreclose — any other potential challenges to the manner in which Boston and Brookline have chosen to exercise their discretion under the Massachusetts firearms licensing statute. By the same token, even though we recognize that the majority of Massachusetts communities have firearms licensing policies that are more permissive than those adopted in Boston and Brookline, we do not regard those policies as relevant to our analysis.

Next, we think it is useful to draw a distinction between two types of firearms licensing regulations. Location-based regulations limit where firearms may be carried. In contrast, applicant-based regulations identify prohibited persons (such as felons) who may be barred from carrying firearms anywhere. The policies at issue here fall into the former category. Thus, we do not pass upon the validity of "prohibited person" regulations. After all, the plaintiffs have not challenged the Commonwealth's requirement, followed fastidiously in Boston and Brookline, that a license to carry firearms may be issued only to a suitable person.

Finally, we deem it helpful to offer a glossary of sorts, defining certain terms as those terms are used in this opinion.

- When we say the "Massachusetts statute," we mean (unless otherwise indicated) the "good reason" requirement of the Massachusetts firearms licensing statute.

- When we refer to the "Boston and Brookline policies," we mean the administration and implementation of the "good reason" requirement by those two municipalities.

- When we say "firearm," we mean a conventional handgun. See Mass. Gen. Laws ch. 140, § 121 (defining "firearm" as "a stun gun or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured"). We do not use this term to refer to assault weapons, which have a separate definition under Massachusetts law. See id.

- When we say in "public," we mean outside of one's home, excluding "sensitive places such as schools and government buildings," where the Supreme Court has cautioned that the regulation of firearms is

"presumptively lawful." Heller, 554 U.S. at 626-27 & n.26.

- The terms "carry" and "carriage" refer to "wear[ing], bear[ing], or carry[ing]" a firearm "upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." Id. at 584 (quoting Muscarello v. United States, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Unless otherwise specified, we use these terms to include both open and concealed carriage. We caution, however, that laws restricting concealed carriage alone may call for a somewhat different analysis. See Hightower, 693 F.3d at 73-74 (finding "[l]icensing of the carrying of concealed weapons" to be "presumptively lawful").

## III. ANALYSIS

The plaintiffs mount two principal claims of error. First, they contend that the right to carry firearms in public for self-defense lies at the core of the Second Amendment and, thus, admits of no regulation. Second, they contend that the Boston and Brookline policies fail under any level of scrutiny that might arguably apply. We approach these claims of error mindful that

- 15 -

our review of the district court's entry of summary judgment is de novo.  See id. at 70; see also Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardía de Jesús, 634 F.3d 3, 10 (1st Cir. 2011) (reviewing constitutional challenge to state law de novo).  This standard is unchanged where, as here, an appeal follows the district court's disposition of cross-motions for summary judgment.  See Blackie v. Maine, 75 F.3d 716, 720-21 (1st Cir. 1996).  The task at hand is simplified by the parties' agreement that there are no genuine issues of material fact and that the critical constitutional questions are purely legal inquiries.

## A. Legal Framework.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  For over two centuries, the Supreme Court said very little either about the meaning of these words or about the scope of the guaranteed right.  In 2008, though, the Court made pellucid that the Second Amendment protects the right of an individual to keep and bear arms (unconnected to service in the militia).  See Heller, 554 U.S. at 592.  Two years later, the Court confirmed that the Second Amendment applies with full force to the states through the Fourteenth Amendment.  See McDonald v. City of Chicago, 561 U.S. 742, 784-85 (2010).

These decisions merely scratched the surface: they did not provide much clarity as to how Second Amendment claims should be analyzed in future cases. In Heller, for example, the Court considered the District of Columbia's near-complete ban on keeping operable handguns in the home. See 554 U.S. at 574-75. The Court concluded that this law infringed "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" — an interest that the Court described as "elevate[d] above all other [Second Amendment] interests." Id. at 635. The Court observed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." Id. at 629. Starting from this premise, the Court decided that the challenged law was so restrictive of the Second Amendment right that it would fail to pass muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." Id. at 628-29.

In the plaintiffs' view, it follows directly from Heller that the Second Amendment guarantees them an unconditional right to carry firearms in public for self-defense. On this basis, they urge us to find that the Boston and Brookline policies are unconstitutional. We are not so sanguine: Heller simply does not provide a categorical answer to whether the challenged policies violate the Constitution. Put another way, nothing in Heller "impugn[s] legislative designs that comprise . . . public welfare

- 17 -

regulations aimed at addressing perceived inherent dangers and risks surrounding the public possession of loaded, operable firearms." Powell v. Tompkins, 783 F.3d 332, 346 (1st Cir. 2015). This conclusion is reinforced by McDonald — a case in which the Court plainly read Heller in this way, observing that Heller "does not imperil every law regulating firearms." 561 U.S. at 786.

Indeed, Heller itself made precisely this point. The majority opinion there stated that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and thus does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" or "for any sort of confrontation." 554 U.S. at 595, 626 (emphasis omitted). The Court went on to provide a non-exhaustive list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27 & n.26.

Even so, the Heller Court never presumed "to clarify the entire field" of permissible Second Amendment regulation. Id. at 635. Of particular pertinence for present purposes, Heller was silent about both "the scope of [the Second Amendment] right beyond

the home and the standards for determining when and how the right can be regulated by a government." Kachalsky, 701 F.3d at 89.

In the decade since Heller was decided, courts have adopted a two-step approach for analyzing claims that a statute, ordinance, or regulation infringes the Second Amendment right. See, e.g., Young v. Hawaii, 896 F.3d 1044, 1051 (9th Cir. 2018); Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013); Woollard v. Gallagher, 712 F.3d 865, 874-75 (4th Cir. 2013); Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA), 700 F.3d 185, 194 (5th Cir. 2012); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); see also Powell, 783 F.3d at 347 n.9. Under this approach, the court first asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee. See NRA, 700 F.3d at 194. This is a backward-looking inquiry, which seeks to determine whether the regulated conduct "was understood to be within the scope of the right at the time of ratification." United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010). Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth

Amendment was ratified).[3]  See Greeno, 679 F.3d at 518.  If the challenged law imposes no such burden, it is valid.  If, however, it burdens conduct falling within the scope of the Second Amendment, the court then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny.  See Drake, 724 F.3d at 429; Woollard, 712 F.3d at 875.

Although we have not yet explicitly adopted this two-step approach,[4] we do so today.  This approach results in a workable framework, consistent with Heller, for evaluating whether a challenged law infringes Second Amendment rights.

### B. Scope of Second Amendment Right.

The framework requires that we start by pondering "whether the conduct at issue was understood to be within the scope

---

[3] This date contrasts with the date of ratification of the Second Amendment itself (1791).  It is not at all clear to us that the scope of the Second Amendment should be different when analyzing a federal law than when analyzing a state law.  Here, however, we need not probe this point: our conclusion with respect to the historical record would be the same regardless of which ratification date was used.

[4] On occasion, though, we have employed an analysis that resembled some part of the framework.  Thus, in United States v. Rene E., we traced the historical roots of laws prohibiting minors from possessing firearms from the founding era through the early twentieth century and concluded that the challenged law was of a type historically understood to be consistent with the Second Amendment.  See 583 F.3d 8, 14-16 (1st Cir. 2009).  So, too, in United States v. Booker, we employed a form of means-end scrutiny to find the law at issue substantially related to an important governmental interest.  See 644 F.3d 12, 25-26 (1st Cir. 2011).

of the right at the time of ratification." Woollard, 712 F.3d at 875 (quoting Chester, 628 F.3d at 680). After a diligent search for the answer to this question, we find — as have several of our sister circuits — that there is no national consensus, rooted in history, concerning the right to public carriage of firearms. See Drake, 724 F.3d at 431; Kachalsky, 701 F.3d at 91. The available guideposts point in conflicting directions and leave the indelible impression "that states often disagreed as to the scope of the right to bear arms." Kachalsky, 701 F.3d at 91. Courts that have found the history conclusive relied primarily on historical data derived from the antebellum South. See, e.g., Young, 896 F.3d at 1054-57; Wrenn v. District of Columbia, 864 F.3d 650, 660-61 (D.C. Cir. 2017). But we find it unconvincing to argue that practices in one region of the country reflect the existence of a national consensus about the implications of the Second Amendment for public carriage of firearms. After all, our nation is built upon its diversity — and there is no principled way that we can assume that practices in one region are representative of all regions. We must use a wider-angled lens.

The view through this wider-angled lens tells a different tale. A comprehensive survey of the historical record — including the laws of Massachusetts, which "first adopted a good cause statute in 1836" — reveals that "states and their predecessor colonies and territories have taken divergent approaches to the

- 21 -

regulation of firearms." Young, 896 F.3d at 1076, 1078 (Clifton, J., dissenting).

The short of it is that the national historical inquiry does not dictate an answer to the question of whether the Boston and Brookline policies burden conduct falling within the scope of the Second Amendment. Since we have previously exhibited considerable hesitancy to extend the Second Amendment right beyond the home, see Powell, 783 F.3d at 348; Hightower, 693 F.3d at 72 n.8, this phase of our inquiry brings us into uncharted waters.

The Supreme Court's seminal decision in Heller guides our voyage. The Heller Court left no doubt that the right to bear arms "for defense of self, family, and property" was "most acute" inside the home. 554 U.S. at 628. If the right existed solely within the home, the Court's choice of phrase would have been peculiar. See Moore v. Madigan, 702 F.3d 933, 935-36 (7th Cir. 2012). So, too, the Heller Court stated that prohibitions on carrying firearms in "sensitive places" are "presumptively lawful," 554 U.S. at 626-27 & n.26 — a pronouncement that would have been completely unnecessary if the Second Amendment right did not extend beyond the home at all. Reading these tea leaves, we view Heller as implying that the right to carry a firearm for self-defense guaranteed by the Second Amendment is not limited to the home.

Withal, Heller did not supply us with a map to navigate the scope of the right of public carriage for self-defense. For example, Heller did not answer whether every citizen has such a right, or whether (as Boston and Brookline have concluded) the right is more narrowly circumscribed to those citizens who can establish an individualized reason to fear injury. In the absence of such guidance, we decline to parse this distinction today and proceed on the assumption that the Boston and Brookline policies burden the Second Amendment right to carry a firearm for self-defense.

## C. **Level of Scrutiny**.

This conclusion brings into sharp relief the next step in our inquiry, which requires us to evaluate the challenged policies under an appropriate level of scrutiny. The plaintiffs argue that any law regulating the carriage of firearms for self-defense should be subject to strict scrutiny because the Second Amendment right is specifically articulated in the Constitution. This argument bites off more than the plaintiffs reasonably can expect to chew. Strict scrutiny does not automatically attach to every right enumerated in the Constitution. See, e.g., Kelo v. City of New London, 545 U.S. 469, 480 (2005) (refusing to apply strict scrutiny in Takings Clause context); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restriction challenged

on First Amendment grounds).  Even though the Second Amendment right is fundamental, the plaintiffs have offered us no valid reason to treat it more deferentially than other important constitutional rights.  Consequently, we decline the plaintiffs' invitation to take a one-size-fits-all approach to laws that burden the Second Amendment right to any extent.  See NRA, 700 F.3d at 198; see also Heller II, 670 F.3d at 1256 ("The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake.").

In our judgment, the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right.  See NRA, 700 F.3d at 195; Ezell, 651 F.3d at 703.  A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny.

This gets us to the heart of the matter:  whether public carriage of firearms for self-defense is a core Second Amendment right?  In an earlier case, we identified the core of the Second Amendment right as "the possession of operative firearms for use in defense of the home" by responsible, law-abiding individuals.

- 24 -

Hightower, 693 F.3d at 72. We went on to hold "that the interest . . . in carrying concealed weapons outside the home is distinct from th[e] core interest emphasized in Heller." Id. As the court below observed, "[a]lthough Hightower did not consider the constitutionality of regulating the open carrying of weapons outside the home, the authority it cited did not distinguish between [concealed and open carry], suggesting that the operative distinction [between the core and the periphery of the Second Amendment] was whether the individual asserted his Second Amendment right outside or inside the home." Gould, 291 F. Supp. 3d at 169.

We make explicit today what was implicit in Hightower: that the core Second Amendment right is limited to self-defense in the home. This holding finds support in a number of out-of-circuit cases. See, e.g., United States v. Focia, 869 F.3d 1269, 1285 (11th Cir. 2017); Tyler v. Hillsdale Cty. Sheriff's Dep't, 837 F.3d 678, 685 (6th Cir. 2016) (en banc); Drake, 724 F.3d at 436; Wollard, 712 F.3d at 876; NRA, 700 F.3d at 206; Kachalsky, 701 F.3d at 93; Reese, 627 F.3d at 800.

To be sure, some courts have formulated broader conceptions of the core of the Second Amendment — conceptions that include carrying firearms in public for self-defense. See Young, 896 F.3d at 1070; Wrenn, 864 F.3d at 661. Each of these decisions, though, was reached by a divided panel over a cogent dissent. See

Young, 896 F.3d at 1074 (Clifton, J., dissenting); Wrenn, 864 F.3d at 668 (Henderson, J., dissenting).

We think that the weight of circuit court authority has correctly identified the core of the Second Amendment, and our own precedent fits comfortably within those boundaries. We think, too, that this configuration of the Second Amendment's core interest is consistent with Heller, in which the Court declared that the home is where "the need for defense of self, family, and property is most acute," such that the Second Amendment "elevates above all other interests the . . . defense of hearth and home." 554 U.S. at 628, 635; see GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012) (explaining that the Heller Court "went to great lengths to emphasize the special place that the home — an individual's private property — occupies in our society").

Societal considerations also suggest that the public carriage of firearms, even for the purpose of self-defense, should be regarded as falling outside the core of the Second Amendment right. The home is where families reside, where people keep their most valuable possessions, and where they are at their most vulnerable (especially while sleeping at night). Outside the home, society typically relies on police officers, security guards, and the watchful eyes of concerned citizens to mitigate threats. This same panoply of protections is much less effective inside the home.

- 26 -

Police may not be able to respond to calls for help quickly, so an individual within the four walls of his own house may need to provide for the protection of himself and his family in case of emergency. Last — but surely not least — the availability of firearms inside the home implicates the safety only of those who live or visit there, not the general public.

Viewed against this backdrop, the right to self-defense — upon which the plaintiffs rely — is at its zenith inside the home. This right is plainly more circumscribed outside the home. "[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011). These truths are especially evident in densely populated urban areas like Boston and Brookline. See Joseph Blocher, Firearm Localism, 123 Yale L.J. 82, 108 (2013) (explaining that "American cities have traditionally had much more stringent gun control than rural areas").

This sort of differentiation is not unique to Second Amendment rights. Many constitutional rights are virtually unfettered inside the home but become subject to reasonable regulation outside the home. See, e.g., Lawrence v. Texas, 539 U.S. 558, 567 (2003); Stanley v. Georgia, 394 U.S. 557, 565 (1969); see also Payton v. New York, 445 U.S. 573, 596 (1980) (declaring that "a man's house is his castle").

To sum up, we hold that the core right protected by the Second Amendment is — as <u>Heller</u> described it — "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. Public carriage of firearms for self-defense falls outside the perimeter of this core right.

This holding does not end our journey. <u>Heller</u> left open — and we have yet to address — what level of scrutiny applies to laws that burden the periphery of the Second Amendment right but not its core. For the reasons that follow, we decide today that intermediate scrutiny supplies the appropriate test.

To begin, our decision in <u>Booker</u> points us toward this conclusion. There, we applied an unnamed level of scrutiny in evaluating the constitutionality of a law prohibiting domestic violence misdemeanants from possessing firearms. <u>See</u> 644 F.3d at 13, 25-26. Although we abjured any label, the standard that we articulated was indistinguishable from intermediate scrutiny. <u>Compare</u> <u>id.</u> at 25 (requiring "a substantial relationship between the restriction and an important governmental objective"), <u>with</u> <u>Clark</u> v. <u>Jeter</u>, 486 U.S. 456, 461 (1988) (explaining that "[t]o withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective"). Other courts have not minced words but, rather, have affixed the label of "intermediate scrutiny" to the level of scrutiny employed in <u>Booker</u>. <u>See</u>, <u>e.g.</u>, <u>Schrader</u> v. <u>Holder</u>, 704 F.3d 980, 990 (D.C.

Cir. 2013); Kachalsky, 701 F.3d at 93 n.17. Nor have our sister circuits shied away from a conclusion that intermediate scrutiny is the appropriate test for evaluating firearms regulations that burden conduct falling outside the core of the Second Amendment (including "good reason" laws similar to the Massachusetts statute). See Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015); Drake, 724 F.3d at 435; Woollard, 712 F.3d at 876; Kachalsky, 701 F.3d at 96; NRA, 700 F.3d at 196; Ezell, 651 F.3d at 708; see also Tyler, 837 F.3d at 692 (noting "near unanimous preference for intermediate scrutiny" in such cases).

Finally, our conclusion that intermediate scrutiny is appropriate to evaluate firearms regulations that burden rights on the periphery of the Second Amendment fits comfortably in the lacuna left by Heller. The Heller Court found that the District of Columbia's ban on handguns in the home failed under "any of the standards of scrutiny" historically applied by the Court "to enumerated constitutional rights." 554 U.S. at 628-29. This statement implies that there is a role for some level of scrutiny less rigorous than strict scrutiny. Even so, the Court made clear that rational basis review would not be sufficient. See id. at 628 n.27.

Here, all roads lead to Rome. Following this roadmap, we find that a law or policy that restricts the right to carry a firearm in public for self-defense will withstand a Second

Amendment challenge so long as it survives intermediate scrutiny. To pass constitutional muster in this case, then, the defendants must show that the Massachusetts firearms licensing statute, as implemented by the Boston and Brookline policies, substantially relates to one or more important governmental interests. It is to this question that we now turn.

## D. **Applying Intermediate Scrutiny.**

The Massachusetts firearms licensing statute allows (but does not compel) local licensing authorities to issue licenses to applicants who "ha[ve] good reason to fear injury to [themselves] or [their] property." Mass. Gen. Laws ch. 140, § 131(d). It also allows local licensing authorities to issue licenses "for any other reason," with such restrictions as those authorities "deem[] proper." Id. § 131(a), (d). The legislative purpose behind the statute is twofold: to promote public safety and to prevent crime. See Chardin v. Police Comm'r of Bos., 989 N.E.2d 392, 403 (Mass. 2013); Commonwealth v. Seay, 383 N.E.2d 828, 833 (Mass. 1978). In fashioning this regime, Massachusetts endeavored "to prevent the temptation and the ability to use firearms to inflict harm, be it negligently or intentionally, on another or on oneself." Commonwealth v. Lee, 409 N.E.2d 1311, 1315 (Mass. App. Ct. 1980).

It cannot be gainsaid that Massachusetts has compelling governmental interests in both public safety and crime prevention. See, e.g., Schenck v. Pro-Choice Network of W.N.Y., 519 U.S. 357,

- 30 -

376 (1997).  In point of fact, few interests are more central to a state government than protecting the safety and well-being of its citizens.  See United States v. Salerno, 481 U.S. 739, 755 (1987); Watchtower Bible, 634 F.3d at 12; see also United States v. Morrison, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power . . . than the suppression of violent crime . . . .").  Given the obvious importance of the Commonwealth's governmental interests, the question before us reduces to whether the "good reason" requirement is substantially related to those interests.

In answering this question, we start with the premise that courts ought to give "substantial deference to the predictive judgments" of a state legislature engaged in the enactment of state laws.  Turner Broad. Sys., Inc. v. FCC (Turner II), 520 U.S. 180, 195 (1997).  This degree of deference forecloses a court from substituting its own appraisal of the facts for a reasonable appraisal made by the legislature.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 34 (2010).

We caution, however, that deference should not be confused with blind allegiance.  There must be a fit between the asserted governmental interests and the means chosen by the legislature to advance those interests.  See Woollard, 712 F.3d at 878.  In assessing this fit, a perfect match is not required.  See id.  Put another way, a legislature's chosen means need not be

narrowly tailored to achieve its ends:  the fit between the asserted governmental interests and the means chosen by the legislature to advance them need only be substantial in order to withstand intermediate scrutiny.  See Kachalsky, 701 F.3d at 97; cf. Booker, 644 F.3d at 26 (upholding law that "substantially promote[d] an important government interest").  Courts have described this requirement in various ways.  A typical formulation — with which we agree — describes it as "a reasonable fit . . . such that the law does not burden more conduct than is reasonably necessary."  Drake, 724 F.3d at 436; see Woollard, 712 F.3d at 878.

Here, the fit between the asserted governmental interests and the means chosen to advance them is close enough to pass intermediate scrutiny.  The challenged regime does not infringe at all on the core Second Amendment right of a citizen to keep arms in his home for the purpose of self-defense.  Outside the home, the regime arguably does burden a citizen's non-core Second Amendment right.  See supra Sections III.B, III.C.  But in allocating this burden, the Massachusetts legislature was cognizant that firearms can present a threat to public safety. Striving to strike a balance, the legislature took note that some individuals might have a heightened need to carry firearms for self-defense and allowed local licensing authorities to take a case-by-case approach in deciding whether a particular "applicant

has good reason to fear injury." Mass. Gen. Laws ch. 140, § 131(d). In addition, the legislature made appropriate provisions for restricted licenses, thus ensuring that individuals may carry firearms while engaging in hunting, target-shooting, and a host of other pursuits. Those same protections extend to individuals who need to carry firearms for work-related reasons.

Nor do the Boston and Brookline policies result in a total ban on the right to public carriage of firearms. In this respect, the policies coalesce with the Massachusetts statute to form a regime that is markedly less restrictive than the regimes found unconstitutional by the Seventh and Ninth Circuits. The Illinois ban on public carriage struck down by the Seventh Circuit did not give the slightest recognition to the heightened need of some individuals to arm themselves for self-protection, see Moore, 702 F.3d at 940 (noting that "[n]ot even Massachusetts has so flat a ban as Illinois"), and the Hawaii law struck down by the Ninth Circuit created a regime under which not a single unrestricted license for public carriage had ever been issued, see Young, 896 F.3d at 1071 n.21. The Ninth Circuit took pains to distinguish the Hawaii law from laws in which the "good cause" standard "did not disguise an effective ban on the public carry of firearms." Id. at 1072.

The Massachusetts regime is more akin to those regimes upheld in the Second, Third, and Fourth Circuits. See Drake, 724

F.3d at 428-29, 439-40; Woollard, 712 F.3d at 868-70, 882; Kachalsky, 701 F.3d at 85-87, 101. Those regimes — like the regime at issue here — "provided for administrative or judicial review of any license denial, . . . a safeguard conspicuously absent from Hawaii's laws." Young, 896 F.3d at 1072.

The sockdolager, of course, is that the defendants have forged a substantial link between the restrictions imposed on the public carriage of firearms and the indisputable governmental interests in public safety and crime prevention. Massachusetts consistently has one of the lowest rates of gun-related deaths in the nation, and the Commonwealth attributes this salubrious state of affairs to its comprehensive firearms licensing regime. To buttress this point, the defendants have cited several studies indicating that states with more restrictive licensing schemes for the public carriage of firearms experience significantly lower rates of gun-related homicides and other violent crimes. See, e.g., Cassandra K. Crifasi et al., Association Between Firearm Laws and Homicide in Urban Counties, 95 J. Urban Health 383 (2018); Michael Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 Am. J. Pub. Health 1923, 1923-29 (2017); John J. Donahue et al., Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data, the LASSO, and a State-Level Synthetic Controls Analysis, 3, 63 (Nat'l Bureau of Econ. Research, Working Paper No.

- 34 -

23510, 2018). They also cite statistics indicating that gun owners are more likely to be the victims of gun violence when they carry their weapons in public. See Charles C. Branas et al., Investigating the Link Between Gun Possession and Gun Assault, 99 Amer. J. Pub. Health 2034 (2009). Finally, the defendants have expressed a credible concern that civilians (even civilians who, like the plaintiffs, are law-abiding citizens) might miss when attempting to use a firearm for self-defense on crowded public streets and, thus, create a deadly risk to innocent bystanders.[5]

Several other courts of appeals have conducted similar inquiries and have concluded that "good reason" laws are substantially related to the promotion of public safety and the prevention of crime. See Drake, 724 F.3d at 439-40; Woollard, 712 F.3d at 879-80; Kachalsky, 701 F.3d at 98-99; see also Peruta v. Cty. of San Diego, 824 F.3d 919, 942-45 (9th Cir. 2016) (en banc) (Graber, J., concurring). Emblematic of these decisions is the series of conclusions reached by the Fourth Circuit, which found that such laws "protect[] citizens and inhibit[] crime by . . . [d]ecreasing the availability of handguns to criminals via theft"; reduce "the likelihood that basic confrontations between

---

[5] In support of this stated concern, the defendants cite a study finding that highly trained New York City police officers had an average accuracy rate of only eighteen percent in gunfights. See Bernard D. Rostker et al., RAND Ctr. on Quality Policing, Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process 14 (2008).

- 35 -

individuals would turn deadly"; deter "the 'potentially tragic consequences' . . . that can result from the presence of a third person with a handgun during a confrontation between a police officer and a criminal suspect"; "[c]urtail[] the presence of handguns during routine police-citizen encounters"; decrease "the number of 'handgun sightings' that must be investigated"; and "[f]aciliat[e] the identification of those persons carrying handguns who pose a menace." Woollard, 712 F.3d at 879-80 (citations omitted). We agree.

Withal, there are two sides to the story. Fairly viewed, the defendants' judgments about whether reasonable restrictions on the public carriage of firearms advance public safety and prevent crime are plausible, but not infallible. In short, those judgments are open to legitimate debate.

To this end, the plaintiffs present a profusion of countervailing studies and articles. Drawing on these materials, they argue that the increased presence of firearms on public streets would act as a deterrent to criminals, not as a menace to public safety. They also laud the perceived benefits attendant to the defensive use of firearms. See Gary Kleck & Marc Gertz, Armed Resistance to Crime:  The Prevalence and Nature of Self-Defense With a Gun, 86 J. Crim. L. & Criminology 150, 164 (1995). Several amici add their voices to the chorus, debating the findings and

credibility of a kaleidoscopic array of studies and articles.  Some support the plaintiffs; others support the defendants.

Taken in the ensemble, the disparate views expressed in these studies, articles, and other submissions aptly illustrate that we are dealing with matters of judgment, not with matters of metaphysical certainty.  To a large extent, choosing among these disparate views is like choosing from a menu at a popular restaurant:  something can be found to suit every palate and the diner's choice is more likely to reflect her particular taste than the absolute quality of the dish.  In the process of crafting sound policy, a legislature often must sift through competing strands of empirical support and make predictive judgments to reach its conclusions.  See Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 665 (1994) (opinion of Kennedy, J.).  This is plainly an inexact science, and courts must defer to a legislature's choices among reasonable alternatives.  Institutionally, a legislative body is better equipped than a court to assess the compendium of data bearing upon a particular issue and to reach predictive judgments about what those data portend.  See Turner II, 520 U.S. at 195.  This is especially true of fraught issues, such as gun violence:  "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked' and respect for the Government's

conclusions is appropriate." Humanitarian Law Project, 561 U.S. at 34 (quoting Rostker v. Goldberg, 453 U.S. 57, 65 (1981)).

We conclude that this case falls into an area in which it is the legislature's prerogative — not ours — to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments. In dealing with a complex societal problem like gun violence, there will almost always be room for reasonable minds to differ about the optimal solution. It follows, we think, that a court must grant the legislature flexibility to select among reasonable alternatives. It would be foolhardy — and wrong — to demand that the legislature support its policy choices with an impregnable wall of unanimous empirical studies. Instead, the court's duty is simply "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." Turner I, 512 U.S. at 666 (opinion of Kennedy, J.).

Let us be perfectly clear. The problems associated with gun violence are grave. Shootings cut short tens of thousands of American lives each year. Massachusetts has made a reasoned attempt to reduce the risks of gun violence on public streets: it has democratically adopted a firearms licensing statute that takes account of the heightened needs of some individuals to carry firearms for self-defense and balances those needs against the

demands of public safety.  The Boston and Brookline policies fit seamlessly with these objectives.

To cinch the matter, the defendants have adduced evidence sufficient to show a substantial relationship between the challenged regime and important governmental interests.  Though not incontrovertible, this evidence has considerable force — and the legislature was entitled to rely on it to guide its policy choices.  The upshot is a "measured approach" that "neither bans public handgun carrying nor allows public carrying by all firearm owners . . . [leaving] room for public carrying by those citizens who can demonstrate" good reason to do so.  Drake, 724 F.3d at 440.  Consequently, we hold that the Massachusetts firearms licensing statute, as implemented by the Boston and Brookline policies, passes muster under the Second Amendment.

## IV. CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm the district court's entry of summary judgment in favor of the defendants.

**Affirmed.**