# SUPREME COURT OF THE UNITED STATES

## THOMAS ROGERS, ET AL. *v.* GURBIR GREWAL, ATTORNEY GENERAL OF NEW JERSEY, ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 18–824.   Decided June 15, 2020

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE KAVANAUGH joins as to all but Part II, dissenting from the denial of certiorari.

The text of the Second Amendment protects "the right of the people to keep and bear Arms." We have stated that this "fundamental righ[t]" is "necessary to our system of ordered liberty." *McDonald* v. *Chicago*, 561 U. S. 742, 778 (2010). Yet, in several jurisdictions throughout the country, law-abiding citizens have been barred from exercising the fundamental right to bear arms because they cannot show that they have a "justifiable need" or "good reason" for doing so. One would think that such an onerous burden on a fundamental right would warrant this Court's review. This Court would almost certainly review the constitutionality of a law requiring citizens to establish a justifiable need before exercising their free speech rights. And it seems highly unlikely that the Court would allow a State to enforce a law requiring a woman to provide a justifiable need before seeking an abortion. But today, faced with a petition challenging just such a restriction on citizens' Second Amendment rights, the Court simply looks the other way.

Petitioner Rogers is a law-abiding citizen who runs a business that requires him to service automated teller machines in high-crime areas. He applied for a permit to carry his handgun for self-defense. But, to obtain a carry permit in New Jersey, an applicant must, among other things,

demonstrate "that he has a justifiable need to carry a hand-gun." N. J. Stat. Ann. §2C:58–4(c) (West 2019 Cum. Supp.). For a "private citizen" to satisfy this "justifiable need" requirement, he must "specify in detail the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." *Ibid.*; see also N. J. Admin. Code §13:54–2.4 (2020). "Generalized fears for personal safety are inadequate." *In re Preis*, 118 N. J. 564, 571, 573 A. 2d 148, 152 (1990). Petitioner could not satisfy this standard and, as a result, his permit application was denied. With no ability to obtain a permit, petitioner is forced to operate his business in high-risk neighborhoods with no firearm for self-defense.

Petitioner asks this Court to grant certiorari to determine whether New Jersey's near-total prohibition on carrying a firearm in public violates his Second Amendment right to bear arms, made applicable to the States through the Fourteenth Amendment. See *McDonald*, 561 U. S., at 750; see *id.*, at 806 (THOMAS, J., concurring in part and concurring in judgment). This case gives us the opportunity to provide guidance on the proper approach for evaluating Second Amendment claims; acknowledge that the Second Amendment protects the right to carry in public; and resolve a square Circuit split on the constitutionality of justifiable-need restrictions on that right. I would grant the petition for a writ of certiorari.

I

It has been more than a decade since this Court's decisions in *McDonald* v. *Chicago*, *supra*, and *District of Columbia* v. *Heller*, 554 U. S. 570 (2008). In the years since those decisions, lower courts have struggled to determine the proper approach for analyzing Second Amendment challenges.

Although our decision in *Heller* did not provide a precise standard for evaluating all Second Amendment claims, it did provide a general framework to guide lower courts. In *Heller*, we recognized that "the Second Amendment . . . codified a *pre-existing* right." *Id.*, at 592. This right was "enshrined with the scope [it was] understood to have when the people adopted" it. *Id.*, at 634. To determine that scope, we analyzed the original meaning of the Second Amendment's text as well as the historical understanding of the right. We noted that "limitation[s]" on the right may be supported by "historical tradition," but we declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.*, at 626–627. Instead, we indicated that courts could conduct historical analyses for restrictions in the future as challenges arose. *Id.*, at 635.

Consistent with this guidance, many jurists have concluded that text, history, and tradition are dispositive in determining whether a challenged law violates the right to keep and bear arms. See, *e.g.*, *Mance* v. *Sessions*, 896 F. 3d 390, 394 (CA5 2018) (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., dissenting from denial of reh'g en banc); *Tyler* v. *Hillsdale Cty. Sheriff's Dept.*, 837 F. 3d 678, 702–703 (CA6 2016) (Batchelder, J., concurring in most of judgment); *Gowder* v. *Chicago*, 923 F. Supp. 2d 1110, 1123 (ND Ill. 2012); *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1285 (CADC 2011) (*Heller II*) (Kavanaugh, J., dissenting).

But, as I have noted before, many courts have resisted our decisions in *Heller* and *McDonald*. See *Silvester* v. *Becerra*, 583 U. S. \_\_\_, \_\_\_ (2018) (opinion dissenting from denial of certiorari) (slip op., at 11). Instead of following the guidance provided in *Heller*, these courts minimized that decision's framework. See, *e.g.*, *Gould* v. *Morgan*, 907 F. 3d 659, 667 (CA1 2018) (concluding that our decisions "did not provide much clarity as to how Second Amendment claims should be analyzed in future cases"). They then "filled" the

self-created "analytical vacuum" with a "two-step inquiry" that incorporates tiers of scrutiny on a sliding scale. *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F. 3d 185, 194 (CA5 2012); *Powell* v. *Tompkins*, 783 F. 3d 332, 347, n. 9 (CA1 2015) (compiling Circuit opinions adopting some form of the sliding-scale framework).

Under this test, courts first ask "whether the challenged law burdens conduct protected by the Second Amendment." *United States* v. *Chovan*, 735 F. 3d 1127, 1136 (CA9 2013). If so, courts proceed to the second step—determining the appropriate level of scrutiny. *Ibid.* To do so, courts generally consider "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.*, at 1138 (internal quotation marks omitted); see also, *e.g.*, *Gould*, *supra,* at 670–671. Depending on their analysis of those two factors, courts then apply what purports to be either intermediate or strict scrutiny— at least recognizing that *Heller* barred the application of rational basis review. *Chovan*, *supra*, at 1137.

This approach raises numerous concerns. For one, the courts of appeals' test appears to be entirely made up. The Second Amendment provides no hierarchy of "core" and peripheral rights. And "[t]he Constitution does not prescribe tiers of scrutiny." *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___ (2016) (THOMAS, J., dissenting) (slip op., at 12); see also *Heller II*, *supra*, at 1283 (Kavanaugh, J., dissenting) (listing constitutional rights that are not subject to means-ends scrutiny). Moreover, there is nothing in our Second Amendment precedents that supports the application of what has been described as "a tripartite binary test with a sliding scale and a reasonable fit." *Duncan* v. *Becerra*, 265 F. Supp. 3d 1106, 1117 (SD Cal. 2017), aff'd, 742 Fed. Appx. 218 (CA9 2018).

Even accepting this test on its terms, its application has yielded analyses that are entirely inconsistent with *Heller*.

There, we cautioned that "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all," stating that our constitutional rights must be protected "whether or not future legislatures or (yes) even future judges think that scope too broad." 554 U. S*.,* at 634–635. On that basis, we explicitly rejected the invitation to evaluate Second Amendment challenges under an "interest-balancing inquiry, with the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other." *Id.*, at 689 (BREYER, J., dissenting). But the application of the test adopted by the courts of appeals has devolved into just that.[1] In fact, at least one scholar has contended that this interest-balancing approach has ultimately carried the day, as the lower courts systematically ignore the Court's actual holding in *Heller*. See Rostron, Justice Breyer's Triumph in the Third Battle Over the Second Amendment, 80 Geo. Wash. L. Rev. 703 (2012). With what other constitutional right would this Court allow such blatant defiance of its precedent?

Whatever one may think about the proper approach to analyzing Second Amendment challenges, it is clearly time

———————

[1] See, *e.g.*, *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 100 (CA2 2012) (deferring to the legislature's conclusion that "public safety . . . outweighs the need to have a handgun for an unexpected confrontation"); *New York State Rifle & Pistol Assn., Inc.* v. *New York*, 883 F. 3d 45, 64 (CA2 2018) (stating that a "review of state and local gun control" involves a "balancing of the individual's constitutional right to keep and bear arms against the states' obligation to 'prevent armed mayhem'" (quoting *Kachalsky*, *supra,* at 96)), vacated and remanded, *ante,* p. \_\_\_; *Gould* v. *Morgan*, 907 F. 3d 659, 676 (CA1 2018) (stating that "courts must defer to a legislature's choices among reasonable alternatives" when the legislature has "take[n] account of the heightened needs of some individuals to carry firearms for self-defense and balance[d] those needs against the demands of public safety"); *Drake* v. *Filko*, 724 F. 3d 426, 440 (CA3 2013) ("refus[ing] . . . to intrude upon the sound judgment and discretion of the State of New Jersey" that only "those citizens who can demonstrate a 'justifiable need' to do so" may carry handguns outside the home).

for us to resolve the issue.

## II

This case also presents the Court with an opportunity to clarify that the Second Amendment protects a right to public carry. While some Circuits have recognized that the Second Amendment extends outside the home, see *Wrenn* v. *District of Columbia*, 864 F. 3d 650, 665 (CADC 2017); *Moore* v. *Madigan*, 702 F. 3d 933, 937 (CA7 2012), many have declined to define the scope of the right, simply assuming that the right to public carry exists for purposes of applying a scrutiny-based analysis, see *Woollard* v. *Gallagher*, 712 F. 3d 865, 876 (CA4 2013); *Drake* v. *Filko*, 724 F. 3d 426, 431 (CA3 2013); *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 89 (CA2 2012).[2] Other courts have specifically indicated that they would not interpret the Second Amendment to apply outside the home without further instruction from this Court. *United States* v. *Masciandaro*, 638 F. 3d 458, 475 (CA4 2011) ("On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself"); *Williams* v. *State*, 417 Md. 479, 496, 10 A. 3d 1167, 1177 (2011) ("If the Supreme Court . . . meant its holding [in *Heller*] to extend beyond home possession, it will need to say so more plainly"). We should provide the requested instruction.

## A

The text of the Second Amendment guarantees that "the

---

[2] It is not clear how these courts can apply the made-up sliding scale test without determining the scope of the right. See *Peruta* v. *County of San Diego*, 742 F. 3d 1144, 1166 (CA9 2014) (noting that courts "must fully understand the historical scope of the right before [they] can determine whether and to what extent the [challenged law] burdens the right or whether it goes even further and amounts to a destruction of the right altogether" (internal quotation marks omitted)), vacated and reh'g en banc granted, 781 F. 3d 1106 (CA9 2015).

right of the people to keep and bear Arms, shall not be infringed." As this Court explained in *Heller*, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" 554 U. S., at 584. "When used with 'arms,' . . . the term has a meaning that refers to carrying for a particular purpose—confrontation." *Ibid.* Thus, the right to "bear arms" refers to the right to "'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Ibid.* (quoting *Muscarello* v. *United States*, 524 U. S. 125, 143 (1998) (GINSBURG, J., dissenting); alterations and some internal quotation marks omitted).

"The most natural reading of this definition encompasses public carry." *Peruta* v. *California*, 582 U. S. \_\_\_, \_\_\_ (2017) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 5). Confrontations, of course, often occur outside the home. See, *e.g.*, *Moore*, *supra*, at 937 (noting that "most murders occur outside the home" in Chicago). Thus, the right to carry arms for self-defense inherently includes the right to carry in public. This conclusion not only flows from the definition of "bear Arms" but also from the natural use of the language in the text. As I have stated before, it is "extremely improbable that the Framers understood the Second Amendment to protect little more than carrying a gun from the bedroom to the kitchen." *Peruta*, *supra*, at \_\_\_ (opinion dissenting from denial of certiorari) (slip op., at 5).

The meaning of the term "bear Arms" is even more evident when read in the context of the phrase "right . . . to keep and bear Arms." U. S. Const., Amdt. 2. "To speak of 'bearing' arms solely within one's home . . . would conflate 'bearing' with 'keeping,' in derogation of [*Heller*'s] holding that the verbs codified distinct rights." *Drake*, *supra*, at 444 (Hardiman, J., dissenting); see also *Moore*, *supra*, at 936. In short, it would take serious linguistic gymnastics—and a repudiation of this Court's decision in *Heller*—to claim

that the phrase "bear Arms" does not extend the Second
Amendment beyond the home.

## B

Cases and treatises from England, the founding era, and
the antebellum period confirm that the right to bear arms
includes the right to carry in public.

### 1

"[T]he Second Amendment . . . codified a *pre-existing*
right." *Heller*, *supra*, at 592. So, as in *Heller*, my analysis
of the scope of that right begins with our country's English
roots.

In 1328, during a time of political transition, the English
Parliament enacted the Statute of Northampton. The Stat-
ute provided that no man was permitted to "bring . . . force
in affray of the peace, nor to go nor ride armed by night nor
by day, in Fairs, Markets, nor in the presence of the Jus-
tices or other Ministers, nor in no part elsewhere." Statute
of Northampton 1328, 2 Edw. 3, ch. 3. On its face, the stat-
ute could be read as a sweeping ban on the carrying of arms.
However, both the history and enforcement of the statute
reveal that it created a far more limited restriction.

From the beginning, the scope of the Statute of North-
ampton was unclear. Some officers were ordered to arrest
all persons that "go armed," regardless of whether the
bearer was carrying arms peacefully. See Letter to Mayor
and Bailiffs of York (Jan. 30, 1334), in Calendar of the Close
Rolls, Edward III, 1333–1337, p. 294 (H. Maxwell-Lyte ed.
1898). Other officers, however, were ordered to arrest only
"persons riding or going armed *to disturb the peace*." Letter
to Keeper and Justices of Northumberland (Oct. 28, 1332),
in Calendar of the Close Rolls, Edward III, 1330–1333, p.
610 (H. Maxwell-Lyte ed. 1898) (emphasis added).

Whatever the initial breadth of the statute, it is clear that
it was not strictly enforced in the ensuing centuries. To the

contrary, "[d]uring most of England's history, maintenance of an armed citizenry was neither merely permissive nor cosmetic but essential" because "[u]ntil late in the seventeenth century England had no standing army, and until the nineteenth century no regular police force." Malcom, The Right of the People To Keep and Bear Arms: The Common Law Tradition, 10 Hastings Const. L. Q. 285, 290 (1983). Citizens were not only expected to possess arms, they were encouraged to maintain skills in the use of those arms, which, of course, required carrying arms in public. See, *e.g., id.*, at 292 (describing King Henry VIII's order requiring villages to maintain targets at which local men were to practice shooting).

The religious and political turmoil in England during the 17th century thrust the scope of the Statute of Northampton to the forefront. See J. Malcom, To Keep and Bear Arms 104–105 (1994) (hereinafter Malcolm). King James II, a Catholic monarch, sought to revive the Statute of Northampton as a weapon to disarm his Protestant opponents. *Id.*, at 104. To this point, "[a]lthough men were occasionally indicted for carrying arms to terrorize their neighbours, the strict prohibition [of the Statute of Northampton] had never been enforced." *Ibid.* But, in November 1686, the Attorney General brought Sir John Knight—an opponent of James II—to trial before the King's Bench. The information alleged that Knight violated the Statute of Northampton by "walk[ing] about the streets armed with guns, and [entering] into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76. At trial, the Chief Justice of the King's Bench stated that the Statute of Northampton only "punish[ed] people who go armed *to terrify the King's subjects*." *Id.,* at 118, 87 Eng. Rep., at 76 (emphasis added). He explained that the Statute of Northampton was "almost gone in desuetudinem" for "now there be a general connivance to gentlemen to ride

armed for their security." *Rex* v. *Sir John Knight*, 1 Comb. 38, 39, 90 Eng. Rep. 330 (1686). The Chief Justice also noted that only "where the crime shall appear to be malo animo [*i.e.,* with a wrongful intent,] it will come within the Act." *Ibid.* In other words, the Statute of Northampton was almost obsolete from disuse and prohibited only the carrying arms to terrify. Knight was ultimately acquitted.[3]

James II's attempts to disarm his opponents continued. Only two weeks after Knight's acquittal, James II ordered general disarmaments of regions inhabited by his Protestant enemies under the auspices of the Game Act of 1671. See Malcom 105–106. As we explained in *Heller*, "[t]hese experiences caused Englishmen to be extremely wary of concentrated military forces run by the state and to be jealous of their arms." 554 U. S., at 593.

In 1688, James II was deposed in an uprising which came to be known as The Glorious Revolution. Soon thereafter, the English compiled the Declaration of Rights, which contained a list of grievances against James II and sought assurances from William and Mary that Protestants would not be disarmed. See Malcom 115. William and Mary accepted the Declaration of Rights, which was later codified as the English Bill of Rights, agreeing that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 Wm. & Mary, ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).

——————

[3] At least one scholar has asserted that Sir John Knight was acquitted because he fell within the Statute of Northampton's exception for the "King's Officers and Ministers." Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 28, 30 (2012) (internal quotation marks omitted). This assertion has been repudiated by subsequent scholarship. See Kopel, The First Century of Right to Arms Litigation, 14 Geo. J. L. & Pub. Pol'y 127, 135, n. 46 (2016); see also *Young* v. *Hawaii*, 896 F. 3d 1044, 1064, n. 17 (CA9 2018), reh'g en banc granted, 915 F. 3d 681 (CA9 2019). Moreover, regardless of the ground for acquittal, the Chief Justice's pronouncement of law remains.

The Statute of Northampton remained in force following the codification of the English Bill of Rights, but the narrow interpretation of the statute adopted in *Sir John Knight's Case* became blackletter law in England. Writing in 1716, Serjeant William Hawkins, author of an influential English treatise, explained that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People; from whence it seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons." 1 Pleas of the Crown 136 (1716). Theodore Barlow, another legal commentator, also explained that "Wearing Arms, if not accompanied with Circumstances of Terror, is not within this Statute; therefore People of Rank and Distinction do not offend by wearing common Weapons." The Justice of Peace: A Treatise Containing the Power and Duty of That Magistrate 12 (1745). Sir William Blackstone concluded the Statute of Northampton banned only the carrying of "dangerous and unusual weapons." *Heller*, *supra*, at 627 (internal quotation marks omitted). He explained that the right to arms protected by the 1689 English Bill of Rights preserved "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence." 1 Commentaries on the Laws of England 139–140 (1765); see also 2 *id.*, at 412, n. 2 (E. Christian ed. 1794) ("[E]veryone is at liberty to keep or carry a gun, if he does not use it for the [illegal] destruction of game" (editor's note)).

In short, although England may have limited the right to carry in the 14th century, by the time of the founding, the English right was "an individual right protecting against both *public* and private violence." *Heller*, *supra*, at 594 (emphasis added). And for purposes of discerning the original meaning of the Second Amendment, it is this founding era understanding that is most pertinent.

2

Founding era legal commentators in America also under-
stood the Second Amendment right to "bear Arms" to en-
compass the right to carry in public.

St. George Tucker, in his 1803 American edition of Black-
stone's Commentaries, explained that the right to armed
self-defense is the "first law of nature."  1 Blackstone's Com-
mentaries, App. 300.  He described "the right of the people
to keep and bear arms" as "the true palladium of liberty."
*Ibid.*  Tucker makes clear that bearing arms in public was
common practice at the founding: "In many parts of the
United States, a man no more thinks, of going out of his
house on any occasion, without his rifle or musket in his
hand, than a European fine gentleman without his sword
by his side."  5 *id.*, at 19.

Similarly, William Rawle, a member of the Pennsylvania
Assembly that ratified the Bill of Rights, acknowledged the
right to carry arms in public.  A View of the Constitution of
the United States of America 125–126 (1825).  Rawle noted
that the right should not "be abused to the disturbance of
the public peace" and explained that if a man carried arms
"attended with circumstances giving just reason to fear that
he purposes to make an unlawful use of them," he may be
required "to give surety of the peace."  *Id.*, at 126.[4]  But his
general understanding appeared to mirror Hawkins' artic-
ulation of the English right—public carry was permitted so
long as it was not done to terrify.

Other commentators took a similar view.  James Wilson,
a prominent Framer and one of the six original Justices of
the Supreme Court, understood founding era law to pro-
hibit only the carrying of "dangerous and unusual weapons,

———————
[4] Lower courts looking to historical practice have concluded that, even
in these circumstances, if a surety was provided or the accused was ex-
empt from providing a surety, he could continue to bear arms in public.
*Wrenn* v. *District of Columbia,* 864 F. 3d 650, 661 (CADC 2017) (explain-
ing the application of surety laws); *Young*, 896 F. 3d, at 1061–1062.

in such a manner, as will naturally diffuse a terrour among the people." 2 Lectures on Law, in Collected Works of James Wilson 1138 (K. Hall & M. Hall eds. 2007). Charles Humphreys, a law professor, reiterated "that in this country the constitution guarranties to all persons the right to bear arms" and that "it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." A Compendium of the Common Law in Force in Kentucky 482 (1822).

3

This view persisted in the early years of the Republic. The majority of the relevant cases during the antebellum period—many of which *Heller* relied on—support the understanding that the phrase "bear Arms" includes the right to carry in public.

In *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822), the Kentucky Court of Appeals held that its state constitutional right to "bear arms" invalidated a concealed carry restriction. *Id.*, at 91–92. The court stated that "whatever restrains the full and complete exercise of [the right to bear arms], though not an entire destruction of it, is forbidden by the explicit language of the constitution." *Ibid.*

Eleven years after *Bliss*, Tennessee's highest court interpreted its State Second Amendment analog in a similar manner in *Simpson* v. *State*, 13 Tenn. 356 (1833). In that case, a jury convicted Simpson of carrying arms "in a warlike manner . . . and to the great terror and disturbance of . . . good citizens." *Id.*, at 357. Simpson challenged the conviction, arguing that the State merely proved that he carried arms, not that he did so in a manner to provoke violence. *Id.*, at 358. The State asserted that violence was not "essential" to support the conviction, pointing to a statement of Serjeant Hawkins regarding the English Statute of Northampton. *Ibid.* The court rejected the State's argument. First, it noted that the State had selectively quoted

Hawkins' statement about "'dangerous and unusual weapons,'" and that Hawkins actually explained that "persons of quality are in no danger of offending [the Statute of Northampton] by wearing their common weapons . . . in such places and upon occasions in which it is the common fashion to make use of them without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Id.*, at 358–359. Second, the court held that even assuming "that our ancestors adopted and brought over with them [the Statute of Northampton], or [a] portion of the common law," the state-law "right to keep and to bear arms" "completely abrogated it." *Id.*, at 359–360 (internal quotation marks omitted).

In 1840, the Supreme Court of Alabama concluded that, while the legislature could impose limitations on "the manner in which arms shall be borne," it could not bar the right to bear arms in public for self-defense. *State* v. *Reid*, 1 Ala. 612, 616–619. The court upheld a prohibition on the "practice of carrying weapons secretly." *Id.*, at 616 (internal quotation marks omitted). In doing so, however, the court recognized that there were limits to the State's ability to restrict the right to carry in public: "A statute which, under the pretence of regulating, amounts to a destruction of the right [to bear arms], or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Id.*, at 616–617. In the court's view, "it is only when carried openly, that [arms] can be efficiently used for defence." *Id.*, at 619. Thus, the court allowed some regulation of the form of carrying arms in public, but it firmly concluded that the right to carry in public for self-defense could not be eliminated altogether.

Other state courts adopted a similar view. In *Nunn* v. *State*, 1 Ga. 243 (1846), the Supreme Court of Georgia held that "seek[ing] to suppress the practice of carrying certain weapons *secretly* . . . is valid" but that "a prohibition against bearing arms *openly* is in conflict with the Constitution, and

void." *Id.*, at 251. And, in *State* v. *Chandler*, 5 La. 489 (1850), the Supreme Court of Louisiana held that the State could ban concealed carry but that the "right to carry arms . . . in full open view" was "guaranteed by the Constitution of the United States." *Id.*, at 489–490 (internal quotation marks omitted).

These cases show that, with few exceptions,[5] courts in the antebellum period understood the right to bear arms as including the right to carry in public for self-defense.

## C

Finally, in the wake of the Civil War, "there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves." *Heller*, 554 U. S., at 614. These discussions confirm that the Second Amendment right to bear arms was understood to protect public carry at the time the Fourteenth Amendment was ratified.[6]

As I have previously explained, "Southern anxiety about an uprising among the newly freed slaves peaked" after the Civil War. *McDonald*, 561 U. S., at 846 (opinion concurring in part and concurring in judgment). Acting on this fear, States of the "old Confederacy" engaged in "systematic efforts" to disarm recently freed slaves and many of the 180,000 blacks who served in the Union Army. *Id.*, at 847

──────────

[5] In *State* v. *Buzzard*, 4 Ark. 18 (1842), the Supreme Court of Arkansas upheld a law that prohibited concealed carry. *Id.,* at 27 (opinion of Ringo, C. J.); *id.*, at 32 (opinion of Dickinson, J.); but see *id.*, at 34–35 (Lacy, J., dissenting).

[6] Although these discussions occurred well after the ratification of the Bill of Rights, *Heller* treated them as "instructive" in determining the meaning of the Second Amendment. 554 U. S., at 614. The discussions also inform our understanding of the right to keep and bear arms guaranteed by the Fourteenth Amendment as a privilege of American citizenship. See *McDonald* v. *Chicago*, 561 U. S. 742, 837 (2010) (THOMAS, J., concurring in part and concurring in judgment).

(internal quotation marks omitted). "Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves." *Id.*, at 772 (majority opinion). In addition, some States passed laws that explicitly prohibited blacks from carrying arms without a license (a requirement not imposed on white citizens) or barred blacks from possessing arms altogether. See Cottrol & Diamond, The Second Amendment: Toward an Afro–Americanist Reconsideration, 80 Geo. L. J. 309, 344–345 (1991) (compiling laws from Alabama, Louisiana, and Mississippi).

The Federal Government acknowledged that these abuses violated blacks' fundamental right to carry arms in public. In 1866, a report of the Commissioner of the Freedmen's Bureau recognized that "[t]he civil law [of Kentucky] prohibits the colored man from bearing arms" and concluded that such a restriction infringed "the right of the people to keep and bear arms as provided in the Constitution." H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236. Similarly, a circular in a congressional Report acknowledged that "in some parts of [South Carolina,] armed parties are, without proper authority, engaged in seizing all fire-arms found in the hands of the freedmen . . . in plain and direct violation of their personal rights [to keep and bear arms] as guaranteed by the Constitution of the United States." Joint Comm. on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., 229 (1866) (Proposed Circular of Brigadier Gen. R. Saxton). The circular noted the "peaceful and orderly conduct" of freed slaves when carrying arms, as well as their need "to kill game for subsistence, and to protect their crops from destruction by birds and animals," clearly indicating that the bearing of arms occurs in public. *Ibid.* Finally, numerous Congressmen expressed dismay at the denial of blacks' rights to bear arms when discussing the Civil Rights Act of 1866, the Freedmen's Bureau Act of 1866, and the Fourteenth Amendment. See Halbrook, The

Jurisprudence of the Second and Fourteenth Amendments, 4 Geo. Mason L. Rev. 1, 21–25 (1981).

The importance of the right to carry arms in public during Reconstruction and thereafter cannot be overstated. "The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence." *McDonald*, 561 U. S., at 857 (opinion of THOMAS, J.). And, unfortunately, "[w]ithout federal enforcement of the inalienable right to keep and bear arms, . . . militias and mobs were tragically successful in waging a campaign of terror" against Southern blacks. *Id.*, at 856. On this record, it is clear that "the Framers of the Privileges or Immunities Clause and the ratifying-era public understood—just as the Framers of the Second Amendment did—that the right to keep and bear arms" encompassed the right to carry arms in public for self-defense. *Id.*, at 858.

In short, the text of the Second Amendment and the history from England, the founding era, the antebellum period, and Reconstruction leave no doubt that the right to "bear Arms" includes the individual right to carry in public in some manner.

## III

Recognizing that the Constitution protects the right to carry arms in public does not mean that there is a "right to . . . carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U. S., at 626. "The protections enumerated in the Second Amendment . . . are not absolute prohibitions against government regulation." *Voisine* v. *United States*, 579 U. S. \_\_\_, \_\_\_ (2016) (THOMAS, J., dissenting) (slip op., at 17). States can impose restrictions on an individual's right to bear arms that are consistent with historical limitations. "Some laws, however, broadly divest an individual of his Second Amendment rights" altogether. *Ibid.* This case gives us the ideal opportunity to at least begin analyzing which restrictions

are consistent with the historical scope of the right to bear arms.

It appears that a handful of States throughout the country prohibit citizens from carrying arms in public unless they can establish "good cause" or a "justifiable need" for doing so. The majority of States, while regulating the carrying of arms to varying degrees, have not imposed such a restriction, which amounts to a "[b]a[n] on the ability of most citizens to exercise an enumerated right." *Wrenn*, 864 F. 3d, at 666. The Courts of Appeals are squarely divided on the constitutionality of these onerous "justifiable need" or "good cause" restrictions. The D. C. Circuit has held that a law limiting public carry to those with a "good reason to fear injury to [their] person or property" violates the Second Amendment. *Wrenn*, 864 F. 3d, at 655 (internal quotation marks omitted).[7] By contrast, the First, Second, Third, and Fourth Circuits have upheld the constitutionality of licensing schemes with "justifiable need" or "good reason" requirements, applying what purported to be an intermediate scrutiny standard. See *Gould*, 907 F. 3d, at 677; *Kachalsky*, 701 F. 3d, at 101; *Drake*, 724 F. 3d, at 440; *Masciandaro*, 638 F. 3d, at 460.

"One of this Court's primary functions is to resolve 'important matter[s]' on which the courts of appeals are 'in conflict.'" *Gee* v. *Planned Parenthood of Gulf Coast, Inc.*, 586 U. S. ___, ___ (2018) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 1) (quoting this Court's Rule 10(a)). The question whether a State can effectively ban most citizens from exercising their fundamental right to bear arms

———————

[7] A panel of the Ninth Circuit, in an exhaustive and scholarly opinion, also held that a law violated the Second Amendment by limiting public carry to those with "'urgency,'" "'need,'" or a "'reason to fear injury.'" *Young*, 896 F. 3d, at 1048. That decision, however, was vacated when a majority of the active judges on the Ninth Circuit voted to grant en banc review. See 915 F. 3d 681.

surely qualifies as such a matter. We should settle the con-
flict among the lower courts so that the fundamental pro-
tections set forth in our Constitution are applied equally to
all citizens.

*    *    *

This case gives us an opportunity to provide lower courts
with much-needed guidance, ensure adherence to our prec-
edents, and resolve a Circuit split. Each of these reasons is
independently sufficient to grant certiorari. In combina-
tion, they unequivocally demonstrate that this case war-
rants our review. Rather than prolonging our decade-long
failure to protect the Second Amendment, I would grant
this petition.